564 F.2d 1002
 10 ERC 1753, 7 Envtl. L. Rep. 20,772
 BRITISH AIRWAYS BOARD and Compagnie Nationale Air France,
Plaintiffs-Appellees,
v.
The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, William J.
Ronan, Paul Stillman, James G. Hellmuth, Victor R.
Yanitelli, Milton A. Gilbert, James C. Kellogg, III, Alan
Sagner, Joseph F. Cullman, III, Jane Englehardt, Lewis L.
Glucksman, Robert F. Wagner, Commissioners of the Port
Authority of New York and New Jersey, and Howard Schulman,
Commissioner Designate of the Port Authority of New York and
New Jersey, Defendants-Appellants.
 No. 287, Docket 77-7438.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 19, 1977.
Decided Sept. 29, 1977.
 
 Patrick J. Falvey, Gen. Counsel, The Port Authority of New York and New Jersey, New York City (Joseph Lesser, Isobel E. Muirhead, Arthur P. Berg, New York City, Vigdor Bernstein, Pomona, N. Y., Benjamin R. DeCosta, St. Albans, N. Y., Sholem Friedman, New York City, of counsel), for defendants-appellants.
 Peter J. Nickles, Washington, D. C. (William C. Clarke, New York City, William H. Allen, Eugene D. Gulland, John Michael Clear and Covington & Burling, Washington, D. C., of counsel), for plaintiff-appellee British Airways Board.
 John A. Wells, New York City (Stanley Godofsky, Stephen Froling, Timothy R. Cappel and Rogers & Wells, New York City, of counsel), for plaintiff-appellee Compagnie Nationale Air France.
 William D. Denson, New York City, for amici curiae Town of Hempstead, Village of Lawrence, Village of Cedarhurst, Village of Atlantic Beach, and Robert F. Check, Mona Gottesman and Herbert Warshavsky.
 Before KAUFMAN, Chief Judge, and MANSFIELD and VAN GRAAFEILAND, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 Four days after oral argument of this case, the President of the United States decided to permit supersonic transport aircraft service to thirteen American cities under specified restrictions. The President's decision followed sixteen months of demonstration flights at Dulles International Airport in Virginia by the Anglo-French Concorde, during which the noise and vibration levels of the aircraft were carefully monitored. A similar test at New York's John F. Kennedy International Airport, requested by the Secretary of Transportation and which the President "continues to support . . . pending a decision on the final (federal) noise rule," has yet to commence because the airport's proprietor, the Port Authority of New York and New Jersey, refuses to promulgate an acceptable noise rule for supersonic aircraft. Our sole task is to determine the legality of the total ban, which has now endured for more than one and one-half years, imposed by the Port Authority on Concorde flights into Kennedy pending an alleged effort to develop a noise standard.
 
 
 2
 This case, of course, is no stranger to our court. More than three months ago, after a careful review, we held that the Port Authority possessed the power and bore the responsibility to establish fair, even-handed and nondiscriminatory regulations designed to abate the effect of airplane noise on surrounding communities. British Airways v. Port Authority, 558 F.2d 75 (2d Cir. 1977) ("Concorde I"). We urged in that opinion that the Port Authority conclude its study and fix reasonable noise standards "with dispatch", for it was apparent that procrastination would only exacerbate the economic injury already suffered by the airlines, hinder legitimate efforts to determine the technological and commercial feasibility of supersonic aviation and further strain our foreign relations. We also directed Judge Pollack to conduct an evidentiary hearing to determine whether the Port Authority's then 13 month delay in promulgating noise regulations applicable to supersonic aircraft was so excessive as to constitute unfair discrimination and an undue burden on commerce.
 
 
 3
 It was our intention, in deciding as we did, to give the Port Authority another opportunity to come to grips with the problems posed by this clash of opposing forces. We hoped it would resolve the strife being generated by this litigation by, at the least, deciding to promulgate a noise rule equally applicable to all planes landing at Kennedy, without the court's intervention on the details of the Rule.
 
 
 4
 To this day the Port Authority has demonstrated total resistance in responding to the airlines' desire to secure a fair test of their aircraft in New York. Moreover, it is plain from its public statements that the Authority has no intention to resolve this critical issue in the foreseeable future. We cannot countenance such abdication. Accordingly, we will affirm the order of the district court, enjoining further prohibition of Concorde operations at Kennedy Airport until the Port Authority promulgates a reasonable, nonarbitrary and nondiscriminatory noise regulation that all aircraft are afforded an equal opportunity to meet. We have also found it necessary, however, to modify Judge Pollack's order as hereafter indicated.
 
 I. FACTS
 
 5
 The Port Authority's 112 PNdB Noise Rule. The onslaught of civil jet aviation after World War II sorely tested our nation's commitment to make technological progress environmentally acceptable. As the proprietor of two airports in America's most populous city, the Port Authority of New York and New Jersey was thrust at an early date into the forefront of efforts to accommodate the needs of commercial aviation with the understandable desire of airport neighbors to enjoy a reasonable degree of peace and tranquility. Thus, in 1951 the Authority adopted a regulation prohibiting use of any of its facilities without permission. This rule vividly demonstrated the Port Authority's determination to compel the manufacture of quieter aircraft, a desire which was soon underscored by its refusal to accord landing rights to certain jet airplanes whose din was deemed intolerable to surrounding communities.
 
 
 6
 Both the vital importance of the aviation industry to the national economy and basic considerations of fairness, however, required that even the appearance of whim and caprice be eliminated from critical decisions concerning airport access. The Port Authority accordingly retained a consulting firm in 1955, and charged it with developing a method of meaningful quantification of the relative reactions of individuals to the quite different character of noise produced by existing propeller driven aircraft and newer jet engines. By 1958 it was demonstrated that an ordinary person heard 112 PNdB (perceived noise in decibels) emitted by a jet as substantially equivalent to the sound produced by a DC-6B piston airplane. The Port Authority therefore adopted 112 PNdB, as registered at selected monitoring points, to be the maximum permissible noise limit for all aircraft wishing to use John F. Kennedy International Airport.
 
 
 7
 The Port Authority's noise standard, of course, was not intended to transform Jamaica Bay and environs into a sylvan glen. By requiring only that the next generation of civil aircraft be no louder than its noisiest predecessor, the Authority sought a standard which it believed would prevent further deterioration of the area surrounding JFK. The aircraft industry was assured that any plane able to meet the standard, either through quieter engines or noise abating operating procedures, would be welcome in New York. In fact, until the Port Authority imposed the ban on supersonic aircraft that is challenged in the instant suit, not a single jet airplane that met the long-standing 112 PNdB rule was denied access to Kennedy Airport.
 
 
 8
 SST Noise. Since New York is this country's most important international gateway, it is not surprising that the manufacturers of the Concorde, the world's first supersonic commercial passenger airplane, communicated their desire to use JFK to the Port Authority more than seven years ago. At that time John R. Wiley, the Authority's Director of Aviation, warned that SSTs would "be required to meet the same noise levels as will be demanded of subsonic aircraft." In fact, those who built the Concorde were well aware that its noise posed a serious objection to American acceptance of the plane. Accordingly, the French and British spent nearly $100 million on noise abatement alone.
 
 
 9
 Before requesting specific permission to use Kennedy Airport, the owners of Concorde compiled reams of data concerning the likely effects of its noise on airport neighbors. In a series of tests conducted in late 1974 at Casablanca, Morocco and Toulouse, France, the manufacturers of the aircraft proved in conditions closely simulating those at JFK that the Concorde could consistently meet a 109 PNdB standard. Indeed, it was reported that the "Boeing 707 under (its) flight path (had) a distinctly greater spectral content in the more annoying frequency range bands, compared with Concorde." Moreover, the incremental impact of adding several Concorde flights to an already busy airport was found to be minimal. And further testing in January, 1976 demonstrated that even fewer individuals than originally anticipated would be adversely affected by the introduction of Concorde at JFK.
 
 
 10
 Federal Action. In late summer 1975 British Airways and Air France, confident of their aircraft's ability to satisfy applicable regulations, applied to the Federal Aviation Administration for permission to use the SST in transatlantic service to the United States. A thorough Environmental Impact Statement was prepared, and formed the basis for Secretary of Transportation William T. Coleman's careful and comprehensive decision of February 4, 1976, to order provisional amendment of the airlines' operations specifications to permit each carrier to conduct up to two flights daily into Kennedy and one per day into Dulles International Airport. This grant was accompanied by stringent conditions. For example, the Concorde could not travel at supersonic speeds over land areas; it had to observe a 10 P.M. to 7 A.M. curfew; and the aircraft was directed to abide by strict noise abatement procedures as prescribed by the F.A.A. In addition, these amendments were not to be effective beyond sixteen months from the commencement of commercial service. Finally, Secretary Coleman explicitly provided that all flights would cease immediately "in the event of an emergency deemed harmful to the health, welfare or safety of the American people."
 
 
 11
 Before rendering his decision, which we have termed "the very paragon of a clear and considered administrative action", Concorde I, supra at 80, Secretary Coleman painstakingly discussed both the traditionally recognized component of Concorde noise (addressed by the Port Authority's 112 PNdB rule) and its purportedly unique capacity to emit substantial low frequency vibrations. Based on his review of voluminous data, Coleman concluded that the noise of a Concorde at its source was indeed louder than that produced by subsonic aircraft under similar conditions. But this revelation was only the beginning of analysis, for relevant regulations are carefully calculated to reflect the relative subjective impact of aircraft noise on individuals living in the vicinity of airports. In fact, to focus upon the absolute energy emission levels of Concorde's engines without considering the mitigating effect of noise abatement procedures as the amicus curiae does in this case is as empty an exercise as inquiring of a Kantian philosopher whether a tree falling in a deserted forest can be "heard."
 
 
 12
 Coleman thus turned for guidance to a federally prepared Noise Exposure Forecast (NEF), which described the cumulative effect of all aircraft operating at JFK within the course of 24 hours. This index, which included corrections for the discrete whine of certain jet aircraft and penalized flights scheduled during normal sleeping hours, revealed that the addition of eight Concorde flights a day would produce only a negligible impact on the communities surrounding JFK. More specifically, the descriptor indicated that the number of people residing within the NEF 30 contour a term of art applying to those instances in which certain individuals "may complain" would increase by only 0.4%, from 485,000 to 487,000; and within the NEF 40 zone in which "repeated vigorous" complaints would be forthcoming from 112,000 to 114,000, or by 2%. Overall noise in each contour would increase by about 0.3%. Although this meant that a greater number of people would be subjected to a somewhat noisier environment, the Secretary cogently noted that an identical effect would be created (without amending any operating certificates) simply by the addition of "a few extra flights by . . . B-707's or DC-8's."
 
 
 13
 Secretary Coleman also recognized that the sound produced by the Concorde's engines is of a relatively low pitch and thus qualitatively different from that emitted by subsonic aircraft. The plane's deep rumble, he said, would cause minor structural shaking; and the fact that its sound readily penetrates buildings would result in the rattling of dishes and other non-stationary objects within homes. Coleman concluded, however, after a comprehensive survey of the evidence, that "these vibrations do not present any danger of structural damage and little possibility of annoyance." In fact, under the strictly limited regime contemplated in his order, the Secretary was confident that the resulting irritation would be slight, and the Concorde induced vibrations "brief and barely perceptible."
 
 
 14
 In the end, Coleman recognized that a testing period of actual Concorde operations was an essential prelude both to the final decision on the aircraft's acceptability in the United States and to the determination whether public hostility in America's premier commercial center made the development of a second, quieter generation of SSTs economically unfeasible. Raw data alone cannot forecast community response to SSTs, for every individual reacts differently to noise. The sixteen-month demonstration ordered by Coleman was thus a crucible in which to assay subjective attitudes of airport neighbors and our willingness to fairly assess the issue of supersonic transportation. In the words of this court, "the very dimensions of the most significant environmental drawback of the Concorde are impossible to determine without an adequate test." Concorde I, supra, at 80.
 
 
 15
 The Port Authority's Response. While technicians strove to project scientifically the community response to Concorde noise, local leaders on the political scene lobbied to prevent SST landings at Kennedy. On January 5, 1976 New York State Commissioner of Transportation Raymond Schuler conveyed Governor Carey's unqualified opposition to Concorde to Secretary Coleman at a public hearing; he testified to the same effect six weeks later before the Port Authority's Operations Committee. The New York Legislature simultaneously passed a bill banning all SSTs from Kennedy Airport.[1] Although we do not know the impact of these actions on the Commissioners of the Port Authority, who are appointed by the Governors of New York and New Jersey, soon thereafter on March 11, 1976 the Concorde was banned by the Authority from JFK for a period not to exceed six months, during which operations at Dulles, Charles de Gaulle and Heathrow Airports were to be monitored and analyzed.
 
 
 16
 In taking this action, the Port Authority did not apply its existing and well-established 112 PNdB rule to the Concorde. Rather, it suggested that the unique low frequency vibrations produced by the SST's engines "were not necessarily reflected" in the current noise standard. Although Secretary Coleman found the adverse environmental effects of the Concorde's low pitched sound to be negligible, the Port Authority concluded the issue warranted further study. And while the Authority agreed with the Secretary that the subjective reaction of people exposed to SST noise needed further inquiry under actual operating conditions, it questioned whether such testing at JFK was in the "public interest."
 
 
 17
 The Authority also believed it was necessary to retain consultants who would further study the SST and quantify the vibration problem in a manner that would accurately predict community reaction to this unique component of the SST's noise profile. Accordingly, on May 24, 1976 the day that flights began in Washington, D.C. and more than three months after Coleman's exhaustive decision the Port Authority engaged Dr. Karl Kryter of the Stanford Research Institute to examine Concorde noise.[2]
 
 
 18
 Dr. Kryter spent several months recording onto magnetic tape the noise of all types of aircraft, including the Concorde, at JFK, Dulles, Charles de Gaulle and Heathrow Airports. By February, 1977 he had developed a formula that, in his words, "would allow one to a first order of approximation (to) say that if you had the 707 and the Concorde in a given mode of operation with a given level of noises commonly measured, what the relative difference in potential vibration would be." The critical importance of this research cannot be gainsaid, for it demonstrates that eight months ago the Port Authority's principal consultant had devised a means of relating household vibration to the SST's absolute noise levels, a "vibration-rattle index." What Kryter had not been able to do was correlate this figure with the amount of irritation an individual would experience at a given level of noise and vibration.[3]
 
 
 19
 When Dr. Kryter reported these results to the Port Authority in early March, 1977, he was asked to outline a proposal for solving this elusive problem of "additivity." But the Authority has never actually engaged Kryter, or anyone else, to pursue such research. Moreover, he has testified that an additivity study would consume six months to a year, and cost between $500,000 and $1 million. The Port Authority refused to embark upon such an expedition, and has not authorized a single penny to be spent on its completion. Neither, of course, does it wish to assay subjective reaction to vibration through actual test flights, as Secretary Coleman suggested. Thus it is not at all clear to us how the Port Authority intends to solve this additivity dilemma, if indeed it ever expects or wants to do so.
 
 
 20
 Airlines Submit Revised Operating Procedures. While the Port Authority found that the problems of Concorde noise were either intractable or capable of logarithmic expansion, the airlines continued to refine existing data that proved Concorde's ability to meet the longstanding 112 PNdB standard at JFK. Thus, by telex on March 7, 1977 the owners of Concorde detailed certain revised procedures entailing reduced operating weights, specific runway utilization assuring that 98% of departures would occur over water, and a "decelerated approach" making it graphically apparent that the Concorde's noise would not exceed 105 PNdB at any Port Authority meter. In addition, it was again established that the incremental disturbance of individuals within the NEF 30 and 40 contours would be negligible. On April 14 the F.A.A. confirmed the technical validity of the airlines' newest submission. It was now clear not only that the Concorde met the established 112 PNdB rule, but also that its perceived noise "footprint"[4] was comparable to that of the B707-320B.
 
 
 21
 The Port Authority's Response. Although the Port Authority originally had banned the Concorde from JFK for a period not to exceed six months, the agency ultimately established March 10, 1977 a full year after its initial resolution as the date it would render a definitive decision on this important issue. In the period of more than a year since Secretary Coleman's decision, a wealth of new data had been complied to aid the Authority in its task, including monthly progress reports on SST operations at Dulles. All consultants had completed their work and reported their conclusions, and the Port Authority had decided not to authorize any further funding for efforts to quantify Concorde noise. The Commissioners nevertheless answered the airlines' latest initiative by postponing consideration of Concorde landings from March 10 to "a later date." An accompanying press release claimed this course was chosen out of "fairness" to the airlines, implying that they had proved for the first time their aircraft's capability to meet the 112 PNdB rule. But in fact, from the first tests in 1974, there had never been a shred of evidence indicating the SST's inability to meet the rule, and the March 7 submission merely proved the Concorde even quieter than theretofore supposed. In this context it is not surprising that the airlines immediately notified the Port Authority that "our patience has run out," and sought relief in federal court.
 
 
 22
 Litigation, Round 1. On May 11, 1977 Judge Pollack dissolved the Port Authority's ban on Concorde, reasoning that Secretary Coleman's decision to accord the plane limited permission to land in this country preempted any contrary exercise of local authority. British Airways v. Port Authority, 431 F.Supp. 1216 (S.D.N.Y.1977). This court, with the concurrence of the government as amicus, reversed. We held that federal law contemplated a limited role for airport proprietors. We decided that their task was to promulgate reasonable rules to abate noise in the airport and its environs. We also remanded for an evidentiary hearing to ascertain whether the Port Authority had exercised its responsibility in a "fair, reasonable and nondiscriminatory manner" or whether, as urged by the airlines and the United States, the thirteen month delay as it was then in promulgating a uniform noise standard for the Concorde was unreasonable, discriminatory and hence illegal.
 
 
 23
 The Port Authority's Response. Five days before the mandated hearing, on July 7, 1977, the Port Authority's Commissioners voted to indefinitely extend the "temporary" ban imposed sixteen months earlier. The Authority merely reiterated what had been known for years that the Concorde had "unique characteristics including that on landing (it) has a high level of low frequency energy." Despite the receipt of monthly progress reports from Dulles since the inception of service there, the Authority had now grasped another excuse for non-action: it would await a final federal compilation of Concorde data, due in late September. This is puzzling, of course, in light of the Port Authority's repeated disavowal of earlier federal studies favorable to the SST, and its assertion of complete independence in conducting its own examination of Concorde noise.[5] And even more perplexing, since the work of its consultants had ceased four months earlier, was the Authority's statement that a "vibration-rattle index is being further studied."
 
 
 24
 Judge Pollack's Decision. On August 17, the district judge again struck down the Port Authority's ban of SST flights after concluding that for over a year the agency had been "reploughing old ground and doing re-reviews of scientific and theoretical data previously available." In the view of the district court Dr. Kryter had established nothing beyond what was adequately considered and reported by Secretary Coleman, and the Port Authority had no intention of setting either 112 PNdB or any other noise standard for the Concorde. This total abdication constituted an unreasonable, discriminatory and unfair impingement on commerce. The Port Authority, accordingly, was enjoined from prohibiting further SST flights into JFK if they emitted no more noise than 112 PNdB.
 
 
 25
 Ensuing Action. Neither advocates nor opponents of the Concorde have declared a truce while awaiting our review of the district judge's order. Recently several members of Congress urged that the federal government restudy low frequency vibrations. But, on September 15, 1977 Secretary of Transportation Brock Adams, in separate letters to Elmer Staats, Comptroller of the Currency, and Port Authority Director of Aviation Morris Sloane, declared that it was "unnecessary to define and quantify a vibration-rattle index before initiating regulatory action on new noise standards." In fact, Secretary Adams reported, the vibrations emitted by the SST were no greater than those induced by long range subsonic aircraft, such as the B-747 and DC-10. And since these aircraft have been flying into JFK for several years without apparent rattle problems, the Secretary believed increased structural damage and annoyance to be "improbable." Indeed, the Dulles demonstration, Adams stated, had shown that vibration levels were even less than originally anticipated.[6] Dr. Kryter's report, in the opinion of the Department of Transportation, had not raised any new questions, and the existing data was sufficient to justify the inception of public notice and comment procedures for certification of the Concorde without further delay.[7] This course was followed eight days later when President Carter decided to permit existing Concordes to fly into thirteen American cities, including New York, without requesting further vibration research.
 
 II. DISCUSSION
 
 26
 The law simply will not tolerate the denial of rights by unwarranted official inaction. Cf. NLRB v. Rutter-Rex Mfg. Co., 396 U.S. 258, 265-66, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); Nader v. FCC, 172 U.S.App.D.C. 1, 520 F.2d 182 (1975). If ever there was a case in which a major technological advance was in imminent danger of being studied into obsolescence, this is it. There comes a time when relegating the solution of an issue to the indefinite future can so sap petitioners of hope and resources that a failure to resolve the issue within a reasonable period is tantamount to refusing to address it at all. The same is true of studying the question in such a manner that the issue will disappear by sheer frustration or the assumption by another institution in this case the courts of the task of deciding a charged dispute whose resolution otherwise is the duty of the agency. The hour is at hand for the Port Authority's indefinite ban on Concorde flights to be recognized as an abdication of responsibility. The airlines should no longer be forced to suffer the consequences of such illegal delay.
 
 
 27
 Our initial opinion in this case delineated the extremely limited role Congress had reserved for airport proprietors in our system of aviation management. Common sense, of course, required that exclusive control of airspace allocation be concentrated at the national level, and communities were therefore preempted from attempting to regulate planes in flight. See Allegheny Airlines v. Village of Cedarhurst, 238 F.2d 812 (2d Cir. 1958); American Airlines v. Town of Hempstead, 398 F.2d 369 (2d Cir.), cert. denied 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). The task of protecting the local population from airport noise, however, has fallen to the agency, usually of local government, that owns and operates the airfield. Air Transport Assn. v. Crotti, 389 F.Supp. 58 (N.D.Cal.1975) (three-judge court); National Aviation v. City of Hayward, 418 F.Supp. 417 (N.D.Cal.1976). It seemed fair to assume that the proprietor's intimate knowledge of local conditions, as well as his ability to acquire property and air easements and assure compatible land use, cf. Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed. 585 (1962), would result in a rational weighing of the costs and benefits of proposed service. Congress has consistently reaffirmed its commitment to this two-tiered scheme,[8] and both the Supreme Court and executive branch have recognized the important role of the airport proprietor in developing noise abatement programs consonant with local conditions.[9]
 
 
 28
 The maintenance of a fair and efficient system of air commerce, of course, mandates that each airport operator be circumscribed to the issuance of reasonable, nonarbitrary and nondiscriminatory rules defining the permissible level of noise which can be created by aircraft using the airport. Concorde I, supra at 84. We must carefully scrutinize all exercises of local power under this rubric to insure that impermissible parochial considerations do not unconstitutionally burden interstate commerce or inhibit the accomplishment of legitimate national goals. See Douglas v. Seacoast Products, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). See also 49 U.S.C. § 1651(a) ("provision of fast, safe, efficient and convenient transportation"); 49 U.S.C. § 1346 ("encourage . . . the development of civil aeronautics and air commerce"). And, of course, our task of monitoring the proprietor's observance of the strict statutory obligation to make his facility available for public use on fair and reasonable terms, and without unjust discrimination, 49 U.S.C. § 1718(1),[10] is especially critical in the case of an important international port of call such as New York. For, if each village and hamlet were suffered to summarily prohibit the entry of foreign-made or owned aircraft without promulgating uniform rules, it could make a sham of our country's binding treaty commitments to subject the air carriers of France and Britain only to evenly applied "laws and regulations." See U.S.-France Air Services Agreement, Art. V, 62 Stat. 3445, T.I.A.S. No. 1679 (1947); Bermuda Agreement, Art. 5, 60 Stat. 1499, T.I.A.S. No. 1507 (1946), renegotiated, see Dep't of State Bulletin, Vol. LXXVII, No. 1990 (Aug. 15, 1977); see also Convention on International Civil Aviation (Chicago Convention), 61 Stat. 1180, T.I.A.S. No. 1591 (1946).
 
 
 29
 We thus urged in Concorde I that it was manifestly imperative under our cooperative scheme of aircraft regulation for the Port Authority expeditiously to establish reasonable, nonarbitrary and nondiscriminatory noise regulations at JFK. This it has not done. Rather, the Port Authority has steadfastly refused to accord landing rights to an airplane that is capable of meeting the rule that has consistently been applied to all other aircraft for nearly twenty years 112 PNdB.
 
 
 30
 The district judge, after a hearing, found that the studies by the Authority's consultants were merely redundant of work already thoroughly performed by other agencies. This finding by the judge is not erroneous. We are not, of course, to be understood as saying that the Port Authority must slavishly accept Secretary Coleman's conclusions; but neither can it stall indefinitely when all the information at its disposal either confirms the SST's ability to meet existing noise rules or is impotent to dissuade other responsible officials that the impact of Concorde's low frequency energy emissions on airport neighbors will not be more than minimal at most.
 
 
 31
 While there are no absolute standards by which it may be determined that an inquiry is not being conducted with reasonable dispatch, a court will closely scrutinize the nature and character of the problems before the agency to assess whether the path it has chosen to pursue will resolve those issues in the reasonably foreseeable future. Cf. Deering-Milliken, Inc. v. Johnston,295 F.2d 856 (4th Cir. 1961). Thus, the Port Authority claims that its consultants have found the low frequency vibrations of the Concorde a unique source of annoyance, and begs our indulgence as it petitions for federal aid to develop a "vibration-rattle index". But the federal government shows little interest in the vibration problem, and the President has determined to permit Concorde service in thirteen American cities despite the alleged rattle. We presume the President's decision was prompted by reports, after sixteen months of operations at Dulles, proving SST-induced vibrations which Secretary Coleman had predicted to be "slight, brief and barely perceptible" even less noticeable than originally anticipated and essentially equivalent to those emitted by long range subsonic aircraft. Accordingly, it is highly unlikely that the federal government will soon expend large amounts of money on a project the development of a vibration-rattle index that the Department of Transportation dubs a "useless undertaking".
 
 
 32
 Moreover, it is also clear that the Port Authority is not willing to finance such a project. Dr. Kryter as long ago as March of this year reported significant progress in quantifying a vibration-rattle index. In his opinion the elusive mystery of additivity could be unlocked in less than one year, although at considerable cost. The Port Authority has shown no inclination to fund such an endeavor, yet seeks our sanction to ban Concorde flights while we await development of a noise standard that may never eventuate. We would be remiss if we were to allow the Port Authority to dawdle further on the basis of studies that by its own admission are inconclusive in a manner that threatens irreparable economic injury[11] and constitutes treatment that is anything but even-handed. See Office of Communication of the United Church of Christ v. FCC, 138 U.S.App.D.C. 112, 425 F.2d 543 (1969) (Burger, J.).
 
 
 33
 The final reason assigned by the appellant for its delay in developing a vibration-rattle index and hence, a noise rule for SSTs is that the airlines' submission of revised operating procedures only six months ago forced Dr. Kryter essentially to commence his research anew. But the airlines' specific runway utilization and other proposals merely confirmed what had been apparent for months that the Concorde could meet and surpass the longstanding 112 PNdB standard at JFK. In fact, the revised procedures, whose technical validity was soon assured by the F.A.A., proved that the plane was even quieter than theretofore supposed and comparable in noise intensity to the subsonic B707- 320B. It is hollow to assert the "tardiness" of this unrequested submission as a justification for the Port Authority's inability to devise a suitable noise rule, particularly in light of Dr. Kryter's testimony that the airlines' April 1 data in no way altered his conclusion concerning the vibration issue.
 
 III. RELIEF
 
 34
 Accordingly, we affirm the order of the district court so far as it dissolves the ban on SST flights at Kennedy Airport and permits the Concorde to serve New York under conditions detailed in federal operations specifications. Our holding, however, does not deny the Port Authority the power to adopt a new, uniform and reasonable noise standard in the future,[12] assuming the longstanding 112 PNdB rule, which the Concorde concededly can meet, upon reasoned grounds is deemed inadequate. The district court's order is modified insofar as it fixes 112 PNdB as the only possible standard against which the Port Authority legally can measure the permissible noise of supersonic aircraft at JFK.
 
 
 35
 We underestimate neither the seriousness of the issues confronting the Port Authority nor the difficulties it has encountered in arriving at a suitable resolution. Its ultimate determination will have broad economic, political, social and environmental implications. But making sensitive decisions, and exercising sound judgment even in the face of some nagging uncertainty, is the daily fare of judges, administrators and other public officials. And we have asked no more of the Port Authority than that it meet its admittedly heavy responsibility by adopting a fair noise rule within a reasonable period of time.
 
 MANSFIELD, Circuit Judge (concurring in part):
 
 36
 I agree that the district court's order, as modified, should be affirmed. However, I cannot agree with the majority's characterization of the Port Authority's failure to establish SST noise and vibration standards as "procrastination," "total resistance," "abdication of responsibility," or as "tantamount to refusing to address" the issue, much less that the Port Authority has been politically motivated or "anything but even-handed." In my view these characterizations are unwarranted and ignore the serious problems that have been encountered in obtaining the scientific and attitudinal data required for a decision of such long-range, far-reaching proportions for New York residents. The establishment of noise standards for SSTs at JFK Airport is a matter of vital importance, not just to the plaintiff Airlines and to the maintenance of cordial international relations with England and France,[1] but to more than 500,000 people living near JFK. The commercial SST may not be synonymous with progress if the price is to be increasing noise pollution and vibration of deafening proportions for thousands. Because of this impact on human lives the issue has warranted most careful study even if some delay ensued.
 
 
 37
 If this case involved only a dispute over whether the Port Authority was entitled to ban temporarily commercial flights of a revolutionary new aircraft while it took the necessary steps to develop a suitable standard for regulating the levels of noise and vibration produced by the aircraft, I would uphold such a ban. The case, however, involves a "temporary" ban imposed over 18 months ago that was recently extended indefinitely. Moreover, the Port Authority now finds itself "caught on dead center" in its efforts to develop a noise regulation adapted to the peculiar characteristics of supersonic aircraft, which has led the district court to terminate the Port Authority's ban on Concorde flights. While I join in the affirmance of that order, I do so on different grounds than the majority.
 
 
 38
 I cannot agree with my distinguished colleagues that this record supports a finding that the Port Authority has acted in bad faith or has been derelict in its duty. I am willing to accept the Authority's contrary contention, which appears to be supported by evidence, that it has proceeded in good faith to make a conscientious effort to develop a noise and vibration standard that will be fair and reasonable to plaintiffs and to other prospective SST carriers seeking to use JFK as well as to the more than 500,000 people residing within the sound and vibration "footprint" of SST takeoffs from that airport but that it has been stumped by inability (1) to construct a "noise-vibration" measuring device or index that will be generally acceptable to acoustical scientists, and (2) to fix a maximum level on such an index that would properly balance the conflicting interests of the carriers and the airport's neighbors.
 
 
 39
 Nevertheless, I do not believe that any agency such as the Port Authority is entitled to exclude carriers indefinitely and unconditionally from the use of its facilities without making definitive findings, based on substantial evidence, that the proposed use would jeopardize the health, safety or welfare of the public. This the Port Authority cannot do at this stage. It finds itself in the difficult position of not having enough evidence at this stage to bar the Concorde completely and yet not having enough data to fix reasonable and non-discriminatory noise-vibration levels that will withstand scientific and legal scrutiny. The picture is complicated by the necessity of investing additional hundreds of thousands of dollars of public funds, over and above the more than $250,000 already spent by the Authority, on further research and attitudinal surveys needed to complete the job.
 
 
 40
 Under the circumstances, I concur in the view that continuation of the Port Authority's ban on the Concorde cannot be justified, not because of any fault on its part but because there comes a time when the hourglass runs out and even a public agency must "fish or cut bait." That time has now passed. Moreover, the limited test use of JFK contemplated by the plaintiffs under the Secretary of Transportation's decision might serve the useful purpose of providing the very basis that the Authority needs for on-site monitoring and attitudinal surveys essential to the formulation of reasonable noise-vibration regulations for SST craft.
 
 
 41
 In my view, the problem of measuring the unique combination of noise and vibration generated by the Concorde and of establishing maximum levels of public tolerance is not nearly as simple as my colleagues would make it appear. If this were simply a case of securing SST compliance with the Port Authority's existing noise standard for subsonic jets 112 PNdB there would be no justification for any Port Authority delay once the plaintiffs, in March 1977, finally developed new operating procedures for the Concorde at JFK that would minimize the plane's noise impact so that it could meet the existing subsonic test insofar as it creates noise of a conventional nature. But the problem is more difficult and far-reaching than that. The reasonableness of the Port Authority ban on Concorde flights must be considered in light of what the Port Authority knew about the noise and vibration impact of commercial supersonic air travel when it imposed the ban on March 11, 1976. As Secretary of Transportation William T. Coleman, Jr. observed in his February 4, 1976, decision allowing a 16-month test of the Concorde at Dulles, and, subject to Port Authority permission, at JFK, the Concorde possesses unique noise and vibration characteristics quite different from subsonic aircraft. Secretary Coleman's decision states:
 
 
 42
 "Low frequency components of aircraft noise create community annoyance through induced vibrations of homes and buildings near airports. Because noise generated by the Concorde has a much greater low-frequency content than that of comparable subsonic jets, there has been substantial public concern about the effect of induced vibrations on historic and other buildings, structures, windows and interior furnishings such as pictures, lamps, and dishes. Low frequency sound travels much more readily through the atmosphere and through structures than does the sound produced by other jets. Thus, if the Concorde and a subsonic jet were to generate noise of equal intensity at the aircraft, the Concorde's noise would be of a greater intensity at greater distances from the aircraft, since its sound energy would not dissipate as rapidly. This effect was studied thoroughly by the FAA and is described fully in the final EIS."He further noted that "(s)ince the noise of the Concorde has five times the low frequency content of the noise of most subsonic jets, the vibrational effect will be five times as great" and that "(t)he greatest possibility of annoyance stems from the fact that vibration induced in walls may for a few seconds rattle hanging pictures and dishes and other items which might be standing loose on shelves. Again, however, I emphasize that there is no evidence that structural damage will ensue."
 
 
 43
 The final Environmental Impact Statement prepared by the Federal Aviation Administration and released in September 1975, upon which Secretary Coleman based his decision, had reported:
 
 
 44
 "From Figure 6B, the Concorde's perceived loudness or noisiness under the takeoff flight path is double that of a B-707, four times the noisiness of a B-747 and eight times as loud as a DC-10. The perceived loudness of the Concorde will be annoying. It will interfere with communications and may cause startle.
 
 
 45
 "The Concorde's low frequency spectral content is five times that of present subsonic jet aircraft (Figures 19-22). This low frequency aspect will induce some perceptible vibrational impact. However, while perceptible, the vibrational impact will not exceed any existing standards for structural damage (See Section VI.C.2 and Figures 41-46). Since the low frequency content of Concorde's noise signature will produce some household rattle and interfere with communications, it will be annoying to residents in the immediate airport vicinity."
 
 
 46
 Comparing the Concorde's noise on takeoff with that of conventional subsonic jet aircraft, Secretary Coleman found:
 
 
 47
 "On the Concorde's takeoff using noise abatement procedures, for example, 47.6 square miles of land are subjected to noise levels at or above 100 EPNdB; comparable figures for the B-707 and the B-747 are 7.49 square miles and 2.91 square miles, respectively. This level of noise, 100 EPNdB, is approximately equal to, or perhaps slightly less noisy than, heavy city traffic at a distance of 25 feet, although the period of exposure to the aircraft noise would be short, generally under a minute."
 
 
 48
 Secretary Coleman further projected that at JFK in 1978 approximately 485,000 people would reside in the NEF 30 contour and 114,000 people within the NEF 40 contour as compared with only 1,000 residents around Dulles Airport within the NEF 30 contour and none within the NEF 40 contour.[2] He predicted that as a result of the limited Concorde test operations at JFK an "already severely affected area would be further degraded" whereas "on the basis of NEF data, the effect of the proposed Concorde operations at Dulles will be hardly perceptible." He concluded that this data gave him "no clear direction."
 
 
 49
 Secretary Coleman decided that the inadequacy of the data available to him in February of 1976, together with other policy considerations, justified a limited period of Concorde operations at Dulles and JFK, during which time new data would be collected so that subsequent decisions regarding Concorde operations in this country would be more fully informed. One month later, the Port Authority decided otherwise. Although it also deemed the information then available to be wanting, it chose to withhold approval of Concorde operations at JFK until it had conducted its own investigation of the noise and vibration impact of supersonic flights. In view of the conflicting evidence concerning the impact of the Concorde, as well as the Port Authority's legitimate doubts about the suitability of its 20-year old 112 PNdB standard for measuring supersonic aircraft noise and vibration, I do not view the agency's initial decision as unreasonable.
 
 
 50
 Moreover, the tests conducted at Dulles since Secretary Coleman's decision, while leading to a federal authorization of Concorde landings at various airports in the United States, subject to reasonable and non-discriminatory local regulations, have not indicated that the existing noise regulation at JFK would be adequate to provide reasonable protection against excessive noise pollution by SSTs in the future. Despite Secretary Coleman's prediction that the effect of the proposed Concorde operations at Dulles would be "hardly perceptible," the number of noise complaints at that airport has increased from a total of 77 during the three-year period prior to the introduction of the Concorde to a total of 1,762 complaints during the first 12 months of Concorde operations, of which 1,387 or 79% were complaints about the Concorde. See Statement of Henry S. Eschwege, Director, Community and Economic Development Division, United States General Accounting Office, before the Subcommittee on Environment, Energy and Natural Resources of the House Committee on Government Operations, September 7, 1977.
 
 
 51
 The lodging of some 1,387 complaints against Concorde noise during only one year of very limited test operations at Dulles, registered by those located in an area where only 1,000 people reside, would indicate that even though the Concorde may be able to meet existing Port Authority standards, it may also, because of its additional noise and vibration pollution, be so objectionable at JFK, where over 500,000 people reside within the same contours, as to necessitate more stringent, additional regulations. Even assuming, despite this disproportionately high number of protests from Dulles' neighbors that the Concorde would successfully "play in Peoria" or other less densely populated areas, this does not mean that it would go over, noisewise, in heavily-populated New York.
 
 
 52
 These circumstances, standing alone, might justify a substantial pause in the development of new noise-vibration standards at JFK. In addition, there are other justifications for much of the Port Authority's delay. First, of course, there has been the inherent difficulty in developing a method or index for measuring or quantifying the combination of "vibration plus noise" generated by the SST that will be generally acceptable to acoustical experts. Secondly and most difficult of all is the task of determining the level at which this "vibration plus noise" should be viewed as too excessive to be acceptable to the average "reasonable person" (assuming such a person is to be treated as the standard for this purpose). The Port Authority is not being called upon merely to fix a criterion for a few Concorde flights per day on a limited, experimental basis, but to establish a gauge that will be used for all future SSTs using JFK, of which there may be hundreds, if not thousands, of flights in the years to come. Last, but not least, the Port Authority faces the prospect that if the present trend toward increasing the liability of airport proprietors to their neighboring residents for excessive noise in takeoffs and landings should continue, see Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); Greater Westchester Homeowners Assn. v. City of Los Angeles, 13 Avi. 18, 116 Cal.Sup.Court 1975, the Authority faces possible exposure to many millions of dollars in damages in suits by residents in the vicinity of JFK, based on "taking" or "nuisance" theories, unless it adopts carefully-considered reasonable regulations tailored to the unique environmental problems created by the SST.
 
 
 53
 For these reasons I do not share the view that the Port Authority has in the past been at fault in banning Concorde flights at JFK while it sought to develop a new standard for regulating the noise and vibration produced by supersonic aircraft. However, the circumstances have now changed in a way that leads me to conclude that Concorde test flights into JFK for the period permitted under Secretary Coleman's decision should be permitted. The Port Authority's research effort has stopped at the point where its expert, Dr. Karl Kryter of the Stanford Research Institute, is able to assess only the comparative potential for vibration produced by supersonic and subsonic aircraft. Dr. Kryter virtually concedes that real-life attitudinal data is now essential to enable him to determine how much irritation caused to neighboring residents by Concorde noise and vibration will be reasonably tolerable. As both the majority here and Secretary Coleman have observed, reaction to noise and vibration is essentially a subjective phenomenon. The most sophisticated noise-vibration rattle index will not, by itself, enable the Port Authority to determine the point on the index beyond which an SST may not go because of the excessive irritation to airport neighbors. This judgment must be based, in part, on human experience, which cannot be measured intelligently without actual test flights.
 
 
 54
 The Port Authority contends that test flights should await further experimentation and study. This argument is untenable, however, in light of the Authority's own disinclination to fund further research, and the federal government's apparent satisfaction for its limited purposes with the information currently available.[3] The Port Authority's position has thus been reduced to the assertion that it can justify its ban indefinitely on the basis of its belief that the Concorde will exceed acceptable noise and vibration levels. Yet it is unwilling to define the standards that the airlines are expected to meet. This is an insufficient basis to justify the exclusion of an aircraft that concededly meets the Port Authority's only existing noise regulation. Although plaintiffs will now be permitted to go into JFK on the limited test basis authorized by Secretary Coleman, the Port Authority retains the power, if, as, and when it obtains the essential data, to prescribe reasonable noise and vibration standards that might have the effect of authorizing, limiting or barring the use of JFK by SSTs, depending on the Authority's findings.
 
 
 
 [1]
 This legislation was not binding on the Port Authority, since a similar bill failed of enactment in the New Jersey legislature
 
 
 [2]
 Six months later, on November 8, 1976, the Port Authority employed Dr. Aubrey McKennell, a British psychologist, to conduct an attitude survey of the people living near Heathrow Airport. Although McKennell observed in his final report, dated March, 1977, that "the majority of those who had heard Concorde said its noise was less disturbing than they had anticipated," he concluded that his study on the whole was "inconclusive."
 
 
 [3]
 Thus, the Port Authority's 112 PNdB standard is a subjective measure of annoyance that equates the irritation engendered by a jet engine and the noisiest piston-driven aircraft, a DC-6B. The problem Dr. Kryter was unable to solve was the relative annoyance caused, for example, by a B-707 that emitted 112 PNdB k 1 vibration unit and a Concorde SST that might emit 110 PNdB k 3 vibration units
 
 
 [4]
 Much like isobars on a weather map, the noise "footprint" is created by drawing lines joining areas in the vicinity of an airport that experience the same level of noise from specific aircraft
 
 
 [5]
 In fact, the media reported that President Carter's decision to permit Concorde landings in the United States has resulted in "no change" in the Port Authority's position
 
 
 [6]
 Indeed, it has been found that the vibrations produced by the Concorde are no more annoying to those living under its flight path than the slamming of a door
 
 
 [7]
 A Department of Transportation Information Brief, issued on September 1, 1977, and entitled "Noise Spectra of Concorde and Subsonic Aircraft During Approach" states:
 It seems probable that agreement and/or acceptance of any "vibration-rattle index" would be very unlikely, even after a lengthy and complex research program. Actually, such a program appears to be a useless undertaking. Recent analyses of the low frequency spectra of the Concorde and long-range subsonic aircraft indicate little difference in their potential for inducing structural vibration.
 Moreover, despite protestations to the contrary by the appellants, our independent examination of recent reports issued by NASA and the Environmental Protection Agency similarly discloses no significant commitment to further study of SST vibrations.
 
 
 [8]
 See S.Rep. No. 1353, 90th Cong.2d Sess. 7 (1968) (accompanying 1968 amendments to Federal Aviation Act); H.R.Rep. No. 94-842, 92d Cong.2d Sess. 10 (1972), S.Rep. No. 92-1160, 92d Cong.2d Sess. 10-11 (1972), U.S.Code Cong. & Admin.News 1972, p. 4655 (accompanying 1972 amendments to Noise Control Act)
 
 
 [9]
 See City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 635 n. 14, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); Department of Transportation, Aviation Noise Abatement Policy (Nov. 18, 1976)
 
 
 [10]
 See City of Dallas v. Southwest Airlines Co., 494 F.2d 773 (5th Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974); Aircraft Owners Pilots Ass'n. v. Port Authority, 305 F.Supp. 93 (E.D.N.Y.1969)
 
 
 [11]
 The airlines have submitted affidavits stating that they will lose $300,000 per week so long as the Port Authority's ban continues
 
 
 [12]
 Of course, the Port Authority must afford all aircraft, including the Concorde, a fair and equal opportunity to meet the requirements of any future noise rule
 
 
 [1]
 Ironically it was Napoleon who said, "I have made noise enough in the world already." Reported in B. O'Meara, Napoleon in Exile, 1816 (AMS Press ed. 1969), as quoted in The Home Book of Quotations 625 (B. Stevenson ed. 1967)
 
 
 [2]
 The Federal Aviation Administration's final Environmental Impact Statement analyzes the noise impact of the Concorde in terms of four "noise descriptors," which are scientific methods of representing different aspects of a particular noise impact
 The Noise Exposure Forecast (NEF) is a "noise descriptor" that describes the cumulative noise impact of all the aircraft operating at a given airport during the course of a day. It includes corrections for irritating whines or discrete frequencies in aircraft noise, and for noises occurring during those periods of the day, such as late evening, when loud noises are more disturbing. Use of the NEF descriptor permits an assessment of the extent to which Concorde operations will increase the total noise impact on persons living near an airport.
 Secretary Coleman stated that the following NEF values have been generally accepted as a valid means of assessing community reaction to aircraft noise exposure:
 (1) Individuals residing in an area measured at between NEF 30 and NEF 40 "may complain";
 (2) Individuals residing within an NEF contour greater than 40 can be expected to complain "vigorously and repeatedly";
 (3) The threshold of "possible hearing loss" is reached at NEF 45.
 The Secretary's Decision on Concorde Supersonic Transport 44-48 (Feb. 4, 1976).
 
 
 [3]
 As Chief Judge Kaufman's opinion notes, Secretary of Transportation Brock Adams has recently taken the position, on the basis of a report by his Department's Office of Noise Abatement dated September 1, 1977, that it is unnecessary to define or quantify a "vibration-rattle" index before establishing new noise standards for aircraft, in view of findings that structural vibrations and associated rattling of interior furnishings by Concorde landings were not essentially different from those caused by long-range subsonic aircraft. However, the underlying report made it clear that it was limited to landings, as distinguished from takeoffs, and even then to "Concorde SST approaches utilizing a decelerating procedure" in lieu of a "conventional stabilized approach procedure." With respect to the latter the report concluded:
 "Low-frequency aircraft noise may induce sympathic (sic) vibrations in structures located near aircraft flight paths. At a 'worst-case' location directly under the approach path one nautical mile from runway threshold, the low frequency noise levels generated by Concorde SSTs using a conventional stabilized approach procedure are higher than levels generated by long-range subsonic aircraft (differences in sound pressure level from 4 to 16 dB in one-third-octave bands centered at 125 Hertz and below)."
 Moreover, the foregoing represents solely the reaction of the Department of Transportation, obtained at the request of the United States General Accounting Office, to Dr. Karl Kryter's report regarding the prospective impact of Concorde noise around JFK, which predicted a severe reaction by residents to the rattle. The General Accounting Office reported to Congress on September 7, 1977, through Mr. Henry Eschwege, that the Kryter report was also under review by NASA and EPA, which would advise whether they favored the development of a vibration-rattle index.
 It should further be noted that Secretary Brock Adams' decision on September 23, 1977, to permit Concorde SSTs to land at some 13 American cities is subject to the condition that airport proprietors, including the Port Authority, retain their right "to limit or ban aircraft operations at their airports through reasonable, non-discriminatory noise rules." Except for Dulles Airport, therefore, the federal government's interest in the matter remains a limited one, amounting to little more than a proposal as far as use of various city airports is concerned.