727 F.2d 246
 20 ERC 1546
 GLOBAL INTERNATIONAL AIRWAYS CORP. and American Trans Air,
Inc., Plaintiffs- Appellees,
and
United States of America, Elizabeth Hanford Dole, Secretary
of Transportation, J. Lynn Helms, Administrator of the
Federal Aviation Administration, and Arista International
Airlines, Plaintiffs-Intervenors-Appellees,
v.
The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Alan Sagner,
Robert F. Wagner, Joseph F. Cullman, Jerry Fitzgerald
English, Lewis L. Gluckman, James G. Hellmuth, Philip D.
Kaltenbacher, John G. McGoldrick, Kenneth D. McPherson,
William J. Ronan and Robert V. Van Fossan, Defendants-Appellants.
ZANTOP INTERNATIONAL AIRLINES, INC., Plaintiff-Appellee,
v.
The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Alan Sagner,
Robert F. Wagner, Joseph F. Cullman, Jerry Fitzgerald
English, Lewis L. Gluckman, James G. Hellmuth, Philip D.
Kaltenbacher, John G. McGoldrick, Kenneth D. McPherson,
William J. Ronan and Robert V. Van Fossan, Defendants-Appellants.
BRITISH AIRTOURS LIMITED, Plaintiff-Appellee,
v.
The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Joseph F.
Cullman, Jerry Fitzgerald English, Lewis L. Gluckman, James
G. Hellmuth, William K. Hutchinson, Philip D. Kaltenbacher,
John G. McGoldrick, Kenneth D. McPherson, William J. Ronan,
Alan Sagner, Robert V. Van Fossan and Robert F. Wagner,
Defendants-Appellants.
 No. 1646, Docket 83-6167.
 United States Court of Appeals,
Second Circuit.
 Argued July 14, 1983.
Decided Jan. 31, 1984.
 
 Gerald A. Novack, New York City (William C. Clarke, Robert C. Macek, Frederic W. Parnon, John Sullivan, Barrett Smith Schapiro Simon & Armstrong, New York City, on the brief), for plaintiffs-appellees Global International Airways Corp., American Trans Air Inc., and Zantop International Airlines, Inc.
 Franklin H. Stone, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph Giuliani, U.S. Atty., Thomas D. Warren, Asst. U.S. Atty., New York City, Kenneth N. Weinstein, U.S. Dept. of Transp., Jana McIntyre, Federal Aviation Administration, Washington, D.C., on the brief), for plaintiffs-intervenors-appellees United States, Elizabeth Hanford Dole and J. Lynn Helms.
 Suzette Matthews, Washington, D.C. (Morris R. Garfinkle, Edward D. Greenberg, Galland, Kharasch, Calkins & Morse, P.C., Washington, D.C., on the brief), on submission for plaintiff-intervenor-appellee Arista International Airlines.
 Lawrence Mentz, New York City (Thomas J. Whalen, Moffett B. Roller, Condon & Forsyth, New York City, on the brief), for plaintiff-appellee British Airtours Limited.
 Joseph Lesser, New York City (Patrick J. Falvey, Arthur P. Berg, Milton H. Pachter, Vigdor Bernstein, Jay A. Selcov, Deborah L. Jacobs, The Port Authority of New York and New Jersey, New York City, on the brief), for defendants-appellants.
 Before NEWMAN and WINTER, Circuit Judges, and MALETZ, Senior Judge.*
 WINTER, Circuit Judge:
 
 
 1
 Plaintiffs Global International Airways Corp. and American Trans Air, Inc. began this action in the Southern District of New York seeking to enjoin enforcement of Section 520/0-00 ("Interim Rule") and Section 530/0-00 ("Nighttime Rule") of the Aircraft Noise Regulations promulgated by the Port Authority of New York and New Jersey ("Port Authority"). Plaintiffs-intervenors the United States and Arista International Airlines joined in the action but sought only to enjoin enforcement of the Interim Rule. Separate actions were also brought by plaintiffs Zantop International Airlines and British Airtours Limited, the former seeking to enjoin both rules, the latter to enjoin only the Interim Rule.
 
 
 2
 These actions were consolidated. Ruling from the bench at the conclusion of oral argument and without an evidentiary hearing, Judge Pollack held that the Interim Rule was "in hopeless conflict" with the federal Fleet Compliance Program, 14 C.F.R. Secs. 91.301-.311 and preempted under the Supremacy Clause. 564 F.Supp. 795. Judge Pollack refused to enjoin the Nighttime Rule, however, on the ground that it was a noise limitation of a type left available to municipal airport proprietors by Congress. A preliminary injunction reflecting these conclusions was entered on June 17, 1983. The Port Authority appeals from the order enjoining the Interim Rule. The Nighttime Rule is not at issue on this appeal.
 
 
 3
 Because we have concluded that the Interim Rule is not facially preempted by the federal Fleet Compliance Program, we reverse. We do not reach, however, contentions made by appellees regarding other challenges to the Interim Rule, which in our view require a factual record. Accordingly, we remand the case to the district court for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 4
 In 1968, Congress amended the Federal Aviation Act to give the Federal Aviation Administration ("FAA") responsibility to promulgate "such regulations as the FAA may find necessary to provide for the control and abatement of aircraft noise and sonic boom." Aircraft Noise Abatement Act of 1968, Pub.L. No. 90-411, 82 Stat. 395 (codified at 49 U.S.C. Sec. 1431(b)(1) (1976)). The legislative history of this provision makes clear that Congress intended to continue the division of responsibility for aircraft noise abatement previously worked out between federal and local governments. Under this scheme, states and localities cannot regulate noise by controlling the flight of aircraft taking off or landing at local airports, for this method of regulating noise control is to be exercised exclusively by the federal government. On the other hand, states and localities retain power in their capacity as airport proprietors to establish requirements as to the level of permissible noise created by aircraft using their airports. This power includes the right to deny use of airports to aircraft on the basis of non-discriminatory noise criteria. See S.Rep. No. 1353, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad.News 2688, 2693-94 (quoting and endorsing views set forth by the Secretary of Transportation).
 
 
 5
 In 1969, pursuant to the grant of statutory authority, the FAA promulgated Noise Standards for Aircraft Type and Air Worthiness Certification, 34 Fed.Reg. 18,355 (1969) (codified as amended at 14 C.F.R. Part 36 (1983)) ("Part 36" standards). Part 36 established uniform procedures for the measurement of airplane noise as well as minimum noise standards for large aircraft. The Part 36 standards also established three noise categories for large jet aircraft--Stage 1, Stage 2 and Stage 3. Aircraft designed and built before the effective date of the original Part 36 standards are Stage 1 aircraft, not subject to any federal noise standard. 14 C.F.R. Sec. 36.1(f)(2). Stage 2 aircraft are those which meet the original Part 36 standards. 14 C.F.R. Sec. 36.1(f)(4), App. C Sec. C36.5(a)(2). Stage 3 aircraft, the least noisy of the three types, meet noise standards established by the FAA for airplane types which received certification after 1975. 14 C.F.R. Sec. 36.1(f)(6), App. C. Sec. C36.5(a)(3).
 
 
 6
 The preamble to Part 36 announced as a national policy goal the eventual extension of its standards to all passenger jets manufactured and operating in the United States, a goal that necessarily implied the eventual elimination of the use of Stage 1 aircraft. The preamble also stated, however, that "[t]he noise limits specified in Part 36 ... are not intended to substitute federally determined noise levels for those more restrictive limits determined to be necessary by individual airport proprietors." 34 Fed.Reg. 18,355 (1969).
 
 
 7
 A program for the nationwide implementation of the Part 36 standards was announced by the FAA in 1976. Operating Noise Limits, 41 Fed.Reg. 56,046 (1976) (codified at 14 C.F.R. Secs. 91.301-.311 as amended (1983)) ("Fleet Compliance Program"). According to this program, each domestic air carrier was to have: (i) 25 percent of its four-engine jets and 50 percent of its other aircraft in compliance with the Part 36 standards by January 1, 1981; (ii) 50 percent of its four-engine jets and all its other aircraft in such compliance by January 1, 1983; and (iii) all its aircraft in such compliance by January 1, 1985. 14 C.F.R. Sec. 91.305. In short, the Fleet Compliance Program established a timetable for the gradual elimination or retrofitting of Stage 1 aircraft over an eight-year period.
 
 
 8
 In a policy statement released shortly before the promulgation of the program, the FAA emphasized that its schedule of phased compliance had been carefully tailored to be both technologically practicable and economically reasonable. Department of Transportation & Federal Aviation Administration Aviation Noise Abatement Policy (1976) ("Policy Statement"). It also warned that "[m]easures imposed by other jurisdictions that would require more accelerated compliance with Part 36 requirements would conflict with the purpose of this federal regulation." Policy Statement at 41.
 
 
 9
 Certain exemptions were granted from the interim phase-out mandated by the federal Fleet Compliance Program. These included certain foreign registered aircraft on the ground that the application of noise standards to foreign aircraft should be arranged through international negotiations conducted under the auspices of the International Civil Aviation Organization ("ICAO"). Policy Statement at 42. The FAA warned, however, that if an international agreement were not reached by January 1, 1980, it unilaterally would require compliance by aircraft engaged in international commerce by January 1, 1985. Id. In the meantime, to avoid placing domestic carriers at a competitive disadvantage, the FAA announced that the portion of a United States carrier fleet engaged in foreign commerce would be exempted from the requirements of the Federal Fleet Compliance Program. Id.
 
 
 10
 Congress examined the FAA's Fleet Compliance Program when it considered the Aviation Safety and Noise Abatement Act of 1979 ("ASNA"), Pub.L. No. 96-193, 94 Stat. 50 (codified as amended at 49 U.S.C. Secs. 2101-2125). With respect to foreign-registered aircraft, Congress directed the FAA to commence a rulemaking proceeding in the event no international agreement were reached, requiring both domestic and international carriers engaged in international commerce to comply with the standards of Part 36 and the Fleet Compliance Program by January 1, 1985, 49 U.S.C. Sec. 2122(a). Congress further required that domestic carriers be treated no more stringently than foreign ones in this rulemaking. Id. The legislative history of ASNA indicates that it was not intended to alter the existing allocation of powers between the federal government and airport proprietors. S.Rep. No. 52, 96th Cong., 2d Sess. 13, reprinted in 1980 U.S.Code Cong. & Ad.News 89, 91-92, 117.
 
 
 11
 No international solution having been arranged through ICAO, the FAA in 1980 amended the Fleet Compliance Program to require that foreign-registered aircraft be in full compliance by January 1, 1985. 14 C.F.R. Sec. 91.305(c). In keeping with ASNA's requirement that domestic carriers not be treated more stringently than foreign carriers, the FAA also exempted the portion of a domestic carrier's fleet engaged in foreign commerce from compliance until January 1, 1985. Id. The FAA elected to make neither the foreign carriers nor the relevant portions of domestic fleets subject to the interim phase-out requirements. See Operating Noise Limits, 45 Fed.Reg. 79,302, 79,310 (1980).
 
 
 12
 Against this statutory and regulatory backdrop, the Port Authority adopted in April, 1982, Aircraft Noise Restrictions, applicable to all foreign and domestic carriers operating at the three major airports administered by the Port Authority: John F. Kennedy International, Newark International and LaGuardia. Among these was the Interim Rule, which provided that:
 
 
 13
 Effective January 1, 1983, the operators of subsonic jet airplanes exceeding 75,000 pounds in maximum certificated takeoff weight shall conduct airplane movements at a Port Authority airport so that the percentage of movements by their noise compliant airplanes in each calendar quarter at such airport shall be equal to or greater than: 75% for four-engine airplanes, 100% for three-engine airplanes, and 50% for two-engine airplanes.
 
 
 14
 Aircraft Noise Restrictions, Interim Rule, Section 520/0-00. The term "noise compliant airplane" is defined in terms of the noise classification system developed by the FAA as follows:
 
 
 15
 (1) a Stage 2 or Stage 3 airplane; (2) an airplane whose measured or estimated noise levels, based upon data contained in Federal Aviation Administration Advisory Circulars, satisfy the certification requirements set forth in Part 36 or Annex 16 (including the use of applicable tradeoff provisions) for the noisiest Stage 2 airplane operating at each Port Authority airport on the effective date of these rules; or (3) a Stage 1 airplane operating under an exemption specified in Sections 560/0-04 and 560/0-05 hereof.
 
 
 16
 Aircraft Noise Restrictions definitions, Section 510/0-00. Procedures were established under which carriers can seek waivers of the Interim Rule from the Port Authority. Aircraft Noise Restrictions, Section 550/0-00.
 
 
 17
 Nineteen carriers sought such waivers and all nineteen applications were refused in April, 1983. Among the carriers that had sought waivers were plaintiffs Global International Airways Corporation and American Trans Air, Inc., the two largest domestic flag carriers engaged exclusively in charter operations. Global and Trans Air are heavily dependent on their operations at Port Authority airports. Not being subject to the interim deadlines set by the Fleet Compliance Program so far as their international operations are concerned, they have recently purchased used Stage 1 aircraft.
 
 
 18
 Enforcement of the Interim Rule, which the Port Authority announced would begin on July 20, 1983, has been stayed pending the outcome of this appeal. Because we conclude that the Interim Rule is not facially preempted under the Supremacy Clause, we reverse and remand to the district court for further proceedings consistent with this opinion.
 
 DISCUSSION
 
 19
 Because there has not been an evidentiary hearing, we are faced here with a clear cut issue of law. Plaintiffs and intervenors offer two arguments that the Interim Rule is facially preempted under the Supremacy Clause. The first contention is that the subject matter of the Interim Rule is not within the local airport proprietor's authority to regulate the " 'permissible level of noise which can be created by aircraft using the airport.' " British Airways Board v. Port Authority, 558 F.2d 75, 84 (2d Cir.1977) (emphasis in the original) (quoting S.Rep. No. 1353, 90th Cong., 2d Sess. 6, reprinted in 1968 U.S.Code Cong. & Ad.News 2688, 2694). The second is that the Interim Rule specifically conflicts with federal requirements in an area, fleet composition, which is exclusively occupied by the federal government. We address each of these contentions in turn.
 
 
 20
 Plaintiffs contend that the Interim Rule is not a regulation of the "permissible level of noise at airports" because it does not address the level of noise produced by an individual aircraft. Under the Interim Rule, an operator's right to use a Stage 1 aircraft depends on its ability to arrange for the additional use of noise-compliant aircraft. An aircraft may be barred to one carrier but used by another if the latter is able to mix the noisier plane's flights with those of complying aircraft. Plaintiffs thus argue that the Interim Rule does not regulate the permissible level of noise.
 
 
 21
 We do not agree with the underlying assumption of plaintiffs' argument that a regulation of the permissible level of noise is limited to controlling the decibel level of individual takeoffs and landings and may not seek to limit cumulative noise exposure. The FAA itself has stated that in localities in which noise events are relatively constant, as is the case with the three airports here, cumulative noise exposure is a more serious irritant than the peak noise level of an individual noise event. Policy Statement at 14. When Congress affirmed the power of local proprietors to regulate the level of noise in the Noise Abatement Act of 1968, it drew no distinction between regulations aimed at single-event noise levels and ones aimed at cumulative levels. Absent such an expression of Congressional intent, we will not create such a distinction.
 
 
 22
 Given the facial nature of the issue before us, we must take the Interim Rule at face value as one which regulates the cumulative exposure to noise in areas surrounding the three airports and thus "regulates the permissible level of noise." On the present record, we are unable to determine what the precise effect of the Interim Rule will be on the cumulative level of noise. Since it is alleged that Stage 1 aircraft have been diverted from domestic routes to international traffic because of the terms of the Fleet Compliance Program, the Rule may simply prevent an increase in the cumulative level at those Port Authority airports with heavy international traffic. Or it may, as claimed by the Port Authority, reduce the cumulative exposure to noise at all three airports. The determination of the precise effect, however, is not essential to our conclusion that the Interim Rule regulates the level of noise since the reasonable prospect of a beneficial effect is sufficient to defeat plaintiff's first claim.
 
 
 23
 Plaintiffs' second argument is that the Interim Rule and the federal Fleet Compliance Program are in explicit conflict. They argue that under the Interim Rule domestic carriers must comply with interim deadlines for the elimination of Stage 1 aircraft stricter than those applied at the federal level and that carriers engaged in foreign commerce must comply with interim deadlines where none exist at the federal level. They also cite a number of other conflicts which allegedly prevent the operation at Port Authority airports of certain aircraft holding valid exemptions from the requirements of the Fleet Compliance Program.
 
 
 24
 We note at the outset that this is not a case in which compliance with the federal and local regulations is physically impossible, compare Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or a case in which Congress has displaced local authority by authorizing a scheme of federal regulation so pervasive that an intent to preempt must be inferred, compare Ray v. Atlantic Richfield Co., 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978).
 
 
 25
 There simply is no facial conflict between the federal and local regulations. The Fleet Compliance Program operates directly upon the composition of a carrier's fleet. The Interim Rule operates upon the number of takeoffs and landings during a three-month period at each of three airports. While such a regulation in place at these major airports may affect fleet composition, we cannot conclude on a record consisting largely of pleadings that its actual effect is to cause changes in fleet composition beyond federal requirements.
 
 
 26
 Moreover, the conflicts alleged here result from the existence of local standards in an area in which Congress clearly has permitted local proprietors at least some regulatory authority. Since, as we have stated, limitations on cumulative noise exposure are a valid goal of local airport proprietors as a matter of federal policy, use of a regulation limiting the proportion of "noisy" landings by a particular carrier may be an effective method. Therefore, our inquiry must be to determine whether that particular exercise of regulatory authority "stands as an obstacle to the accomplishment and execution of" an established federal policy. Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 
 
 27
 The United States argues that such an effect need not be shown since, although local airport proprietors may limit noise levels, they may not do so by using means preempted by the federal government. In other words, the Interim Rule fails because it uses a preempted means, fleet composition, to pursue a permitted end, noise control.
 
 
 28
 As a facial challenge to the Interim Rule, the argument is unpersuasive. First, as stated above, regulation of the composition of takeoffs and landings over a three-month period at each of three airports is not necessarily the equivalent of the regulation of a carrier's fleet composition. Second, the argument allows too little leeway for local regulation of the cumulative noise exposure, which is, again as stated above, an important component of the federal scheme itself. Since the kind of regulation utilized by the Port Authority efficiently implements that goal, we are not prepared to hold it unlawful without evidence that it actually impedes federal policy.
 
 
 29
 Nevertheless, local regulation which in fact affects the fleet composition of particular carriers must be examined with a view to determining precisely what that effect is and whether it is an obstacle to the accomplishment of important federal policies. The FAA's resort to the regulation of fleet composition was a consequence of the tension between the goal of noise control and the economic and technological difficulties facing carriers in reducing the noise of their aircraft. The particular means of regulation chosen thus reflected a federal policy designed to bring about a general reduction in noise through a change in fleet composition sufficiently gradual and measured to avoid either disruption in traffic to and from American airports or economic distress among carriers. The Fleet Compliance Program embodies, therefore, the policies of a peculiarly federal nature, since regulation which affects fleet composition has a national impact and calls for federal rather than local remedies.
 
 
 30
 The pace of change in fleet composition has thus been determined by an authorized federal agency with a view to effectuating and reconciling important federal goals. To the extent that local regulation affects that pace and impacts upon the reconciliation of those goals, it may be preempted by the Fleet Compliance Program. That, however, is a factual issue to be determined carrier by carrier, and we must reject the facial challenge because it is not possible on this record to hold that the Interim Rule is an obstacle to the accomplishment of the federal goal of gradual and measured change in fleet composition. We, therefore, reverse the preliminary injunction and remand the case to the district court.
 
 
 31
 Upon remand, any carrier will be free to apply to the district court for appropriate injunctive relief from the Interim Rule upon a showing that the effect of the Rule, either by itself or in combination with similar regulations elsewhere, will be to cause it either to make changes in its fleet composition ahead of that mandated by the Fleet Compliance Program or to endure economic hardship by foregoing passenger traffic. In making this determination, the district court should establish the likely volume of passenger traffic a carrier would maintain in the absence of the Interim Rule and the effect of the Interim Rule upon that projected traffic. If the composition of a carrier's existing fleet is of a nature which would enable it to comply with the Interim Rule without a reduction in its overall passenger traffic, it is not entitled to relief. If the effect is to force a carrier to choose between changes in fleet composition ahead of the Fleet Compliance Program schedule or the reduction of passenger traffic, relief from the Interim Rule should be granted.
 
 
 32
 However, in considering the evidence as to fleet composition, the district court shall take into account the aggregate aircraft owned by corporate parents and subsidiaries lest hardship be artificially manufactured through the creation of separate corporations. The district court shall also disregard hardship claimed as a consequence of the purchase of Stage 1 aircraft after promulgation of the Fleet Compliance Program. While we are not prepared to say that local airport proprietors may enact regulations affecting fleet composition so as to increase the pace of change, we perceive no reason to proscribe such regulations where they affect carriers which have engaged in deliberate retrogression.
 
 
 33
 The federal policy reflected by the Fleet Compliance Program is for a measured change in fleet composition in the direction of noise reduction. Local regulations of noise levels which deter a carrier from purchasing and introducing more Stage 1 aircraft into its fleet are not an "obstacle to the accomplishment" of that program. Appellees claim this result is unfair since certain carriers have relied upon the terms of the Fleet Compliance Program in purchasing Stage 1 aircraft. Any unfairness, however, results more from a failure to predict the outcome of this litigation than from explicit assurances from the government. Carriers exempt from the interim deadlines of the Fleet Compliance Program, however, had a right to believe that they did not have to upgrade their fleet before January 1, 1985, and to the extent they can demonstrate that hardship under the Interim Rule has resulted from their failure to purchase Stage 2 or 3 aircraft, rather than the purchase of more Stage 1 aircraft, they are entitled to relief.
 
 
 34
 Reversed and remanded.
 
 
 
 *
 The Honorable Herbert N. Maletz of the United States Court of International Trade, sitting by designation