**ROSENBALM AVIATION
INC., Plaintiff,**

v.

**PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al.,
Defendants.**

**No. 86 Civ. 2991 (PNL).**

United States District Court,
S.D. New York.

May 20, 1986.

---

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff; Lewis A. Kaplan, of counsel.

Port Authority of New York and New Jersey, New York City, for defendants; Patrick J. Falvey, of counsel.

## OPINION AND ORDER

LEVAL, District Judge.

This is a motion for a preliminary injunction by plaintiff Rosenbalm Aviation, Inc. ("RAI") seeking to enjoin the Port Authority of New York and New Jersey from interfering with RAI's operation of its customers' planes at John F. Kennedy International Airport ("JFK") and Newark International Airport ("Newark"). Defendant contends that RAI's operations are prohibited by a contract it made with the Authority in 1982. Plaintiff contends that the 1982 agreement does not apply to this situation and is, in any case, preempted by federal regulation.

RAI is a Nevada corporation with its principal place of business in Ypsilanti, Michigan. At the present time, RAI is in the business of operating aircraft for Emery Air Freight Corporation ("Emery") and Burlington Northern Air Freight, Inc. ("Burlington Northern"). Defendant Port Authority is a joint agency of the States of New York and New Jersey which, among much else, owns and operates JFK and Newark airports.

The parties first appeared on plaintiff's application for a temporary restraining order on April 15, 1986. At the hearing on that motion, the Port Authority consented to certain conditions allowing RAI to continue its Emery operations at Newark Airport pending the preliminary injunction hearing. Over the following three weeks the parties submitted depositions, affidavits and exhibits constituting the preliminary injunction hearing. RAI is scheduled to begin its Burlington Northern operations into JFK on June 2. The Port Authority has refused to consent to this operation pending decision of the motion, thus necessitating a hasty adjudication.

In order to qualify for a preliminary injunction in this Circuit, plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunctive relief." *Jackson Dairy v. Hood*, 596 F.2d 70, 72 (2d Cir. 1979). Considering all the proofs and circumstances, I find that plaintiff has demonstrated serious issues as to the merits, irreparable harm and a balance of hardships decidedly in its favor. It is entitled to a preliminary injunction.

## I. *Background*

In 1976 the Federal Aviation Administration ("FAA") announced its Fleet Compliance Program, 14 C.F.R. §§ 91.301–.311, designed to bring air carriers into compliance with previously promulgated aircraft noise standards, 14 C.F.R. Part 36. The Part 36 standards categorized large aircraft by the noise they produce as either Stage 1, Stage 2, or Stage 3, Stage 1 being the noisiest and Stage 3 the least noisy.

The Fleet Compliance Program established a gradual phase out of Stage 1 aircraft, with interim goals set in terms of fleet composition for January 1, 1981 and January 1, 1983, culminating in the near total elimination of Stage 1 aircraft by January 1, 1985. 14 C.F.R. §§ 91.303, 91.305.

On April 7, 1982, the Port Authority adopted its own Aircraft Noise Restrictions, imposing stricter standards on air carriers using any of the Port Authority airports. These restrictions included the Interim Rule, § 520/0-00, which required 75% of all aircraft movements of operators of four-engine airplanes exceeding 75,000 pounds (all aircraft relevant to this case) to be made with Stage 2 or Stage 3 airplanes, and the Nighttime Rule, § 530/0-00, which banned all takeoffs and landings of Stage 1 airplanes between 11 p.m. and 6 a.m. Both rules were to take effect on January 1, 1983, but the Interim Rule was delayed by litigation until March 7, 1984. The 1982 Port Authority regulations also provided for exemptions from the Interim and Nighttime Rules under certain circumstances. As of January 1, 1985, the Port Authority Final Rule limited all landings and takeoffs at Port Authority airports to Stage 2 and Stage 3 planes.

At the time the Port Authority promulgated its Aircraft Noise Restrictions, Rosenbalm Aviation owned a fleet of DC-8 cargo planes, all Stage 1, which it used almost exclusively to fly freight for Emery. Since RAI's contract with Emery required flights during the hours covered by the Nighttime Rule, and since its fleet composition did not allow for compliance with the Interim Rule, RAI sought an exemption from the Port Authority. On November 29, 1982 William Rosenbalm, president, general manager, and sole stockholder of RAI signed an agreement pursuant to § 560/0-04 of the Port Authority rules in which the Port Authority stated it "offers to treat your Stage 1 DC-8 airplane operations at ... [JFK and Newark] as Stage 2 airplane operations at such airports, subject to the following:

1. This exemption shall be effective as of January 1, 1983, and shall continue with respect to your Stage 1 DC-8 airplane operations at the designated airports until the earlier of the following dates: January 1, 1985 or the date(s) of actual delivery to you in accordance with the Aircraft Lease appended hereto between Southern Air Transport Inc. and Rosenbalm Aviation Inc. dated August, 1982 (the "Aircraft Lease") of the two Stage 3 airplanes that will replace the airplane operations covered by this exemption....

2. By executing this agreement you hereby represent that you have ordered two Stage 3 airplanes to be delivered by December 1, 1984 and that immediately upon delivery each such airplane will be placed in operation at the designated airports; that each such Stage 3 airplane will be used for scheduled movements at the designated airports until it is replaced by another Stage 3 airplane; ....

In September 1983, Emery announced its intention of acquiring its own fleet of DC8-73F cargo aircraft (Stage 3) for use in its air freight system. Emery engaged RAI to provide pilot service to fly Emery's planes on its routes. Thereafter, RAI disposed of its fleet of Stage 1 DC-8s and cancelled its lease with Southern Air Transport Inc. at the end of 1984. Throughout 1985 (or at least until October 1985), Emery provided RAI with Stage 3 airplanes to be used for Emery's New York area operations.

In August 1985, RAI contracted to provide pilot service to Burlington Northern's airplanes on three Burlington routes, including one into JFK. RAI then requested permission of Port Authority to fly Burlington's Stage 2 DC-8-63F into JFK and Newark. On November 25, 1985, Port Authority denied this request citing the November 1982 "Stage 3 exemption agreement with the Port Authority." Port Authority's letter of denial specified that "operations by [RAI] must be performed with Stage 3 equipment." (Letter of Robert

Aaronson, Port Authority Director of Aviation.)

Representatives of RAI explained that they no longer owned or chose their aircraft but merely provided pilot service. RAI sought unsuccessfully to have the Port Authority reconsider its denial.

In the meantime, Emery replaced the Stage 3 plane it was providing to RAI for the Dayton-Newark route with a Stage 2 plane. On March 26, 1986, the Port Authority ordered the vendors at Newark Airport to deny fuel, air, and power to this plane, effectively preventing it from departing the airport. In order to obtain the release of the plane, RAI executed an undertaking stating "that Rosenbalm Aviation Inc. agrees to be bound by the terms of the Agreement between itself and The Port Authority of New York and New Jersey (the "Port Authority") dated November 19 [sic], 1982 by the undersigned and January 10, 1983 by the Port Authority concerning the usage of Stage 3 aircraft at Port Authority airports."

To accommodate RAI's disability vis-a-vis the Port Authority (other pilots would not have been barred by the Authority's Restrictions from flying Emery's Stage 2 plane), Emery then shifted a Stage 3 plane from its Dayton-Boston route to the Dayton-Newark route. Emery's Senior Vice President of Transportation, Terrence M. Browne testified, however, that this solution was not viable for Emery and that the obligation to provide Stage 3 aircraft to RAI for the Newark operations has led Emery to consider cancelling RAI's contract in whole or in part; Emery has opened discussions with one of RAI's competitors. Mr. Browne testified that if any of RAI's routes were reassigned to another carrier, this would involve "a minimum of six routes...."

The initial flight of Burlington Northern's Stage 2 plane for the JFK route has been delayed by engine trouble, but is now scheduled for early June. Port Authority intends to deny this plane access to New York if it is operated by RAI. It is undisputed that Burlington would be permitted under the Authority's regulation to use the same plane by hiring another pilot service. The Port Authority's General Manager of its Aviation Technical Services Division, James Muldoon, testified that approximately 60% of all flights into JFK and 85% of all flights into Newark were being conducted with Stage 2 craft.

Presently, RAI's entire business consists of operating freighters owned by Emery and Burlington Northern. RAI brought this action to enjoin the Port Authority from preventing it from carrying out its contracts to provide this pilot service to Emery and Burlington.

## II. *Irreparable Harm and Balance of Hardships*

■ Plaintiffs have made a compelling showing of irreparable harm and balance of hardships. Emery has made it clear that it will not dedicate a Stage 3 plane to the Newark-Dayton run for any extended period of time. Use of a Stage 3 plane for the Newark route is uneconomical and unnecessary for Emery, which, as noted above, has already begun discussions with RAI's competition for the reassignment of some or all of RAI's routes. As for Burlington Northern, it does not own a Stage 3 plane. As between replacing its aircraft and replacing its pilot, there can be little doubt it would choose the latter. As these two freight carriers constitute RAI's entire clientele, loss of those contracts would be ruinous to it. There can be little doubt that the action contemplated by the Port Authority would cause irreparable harm to RAI. *See Roso-Lino Beverage Dist. v. Coca-Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984) (the loss of "an ongoing business representing many years of effort" constitutes irreparable harm); *see also Stanley-Fizer Assoc. v. Sport-Billy Productions,* 608 F.Supp. 1033, 1035 (S.D. N.Y. 1985).

■ As to the balance of hardships, Port Authority has shown nothing to offset the likely destruction of plaintiff's business. It argues that the enforceability of its con-

tracts and its right to a *quid pro quo* are threatened by the litigation. On this issue, it is significant that the present motion concerns only a preliminary injunction of temporary duration. If the Port Authority succeeds in showing its contractual entitlement, which is open to considerable doubt as discussed below, its contract right will be vindicated. On the other hand, if the Port Authority is allowed to enforce its claimed rights now before showing entitlement, the issue will be mooted by the destruction of RAI.

The Port Authority concedes that Emery and Burlington may freely fly the very same planes into the same airports using another pilot service. Enforcement of the Authority's contract against RAI would result in no noise reduction whatsoever, as those carriers would simply make other arrangements for the piloting of the same planes. Indeed, the same pilots could continue to service the flights, as employees of one of RAI's competitors. Thus, issuance of the preliminary injunction would not affect the noise level at the New York-New Jersey airports by one decibel. Virtually nothing is at stake but the survival of RAI. The balance of hardships tips decidedly in RAI's favor.

## III. *Fair Ground for Litigation*

The *Jackson Dairy* test requires that, in addition to irreparable harm, plaintiff show either likelihood of success on the merits, or, where the balance of hardships tips decidedly in its favor, "sufficiently serious questions going to the merits to make them a fair ground for litigation...." *Jackson Dairy, supra,* at 72. Because plaintiff is the overwhelming victor in the balance of hardships test, it need not show likelihood of success, but may rely on the second branch of the test by showing serious question for litigation. I find for the reasons discussed below that plaintiff has raised such questions as to the applicability of the November 1982 Exemption Agreement. Although it is not necessary to reach them, further serious questions arise as to federal preemption of this application of the Port Authority's regulations.

### A. *Contract Claims*

Plaintiff argues that the 1982 Exemption Agreement should not be construed to cover this controversy given the intervening change in the nature of RAI's business. When RAI entered into the 1982 Exemption Agreement with the Port Authority, it was engaged in the business of a carrier, and fleet operator. Its difficulties with the Port Authority concerned the compliance of its fleet operations with the Port Authority's regulations. In order to be permitted on a temporary basis to operate its fleet in the New York airports, it undertook to convert the portion of its fleet utilizing the New York airports to Stage 3 aircraft. The conversion, however, never came to pass because, before it was to have been accomplished, RAI lost its customer and disposed of its fleet, going out of the business of carrier-fleet operator. Emery, having acquired its own planes, then hired Rosenbalm as a pilot service to fly its planes.

RAI argues with considerable force that its 1982 Agreement was designed to govern its own fleet operations and had no intended effect on its possible future provision of piloting services to the fleets of others.

Neither the express words, nor the sense, of the 1982 Agreement seem to apply to this situation. RAI was operating its fleet of Stage 1 craft which did not conform to the Authority's regulations. Under the Agreement the Authority temporarily exempted these Stage 1 planes on RAI's undertaking to convert a portion of its fleet to Stage 3 and use those Stage 3 planes at the New York airports. The agreement utilized the following operative clauses:

[The Port Authority offers] to treat *your* Stage 1 DC–8 airplane operations at ... [JFK and Newark] as Stage 2....

This exemption shall be effective ... until the earlier of ... January 1, 1985, or ... actual delivery to you ... of the

two Stage 3 airplanes [you have ordered] that will replace the airplane operations covered by this exemption.

> [Y]ou hereby represent that you have ordered two Stage 3 airplanes ... and that ... each such Stage 3 airplane will be used ... at the designated airports....

Nowhere does this language bar RAI from operating Stage 2 aircraft for customers at New York airports. What it required of RAI was that it replace certain of *its* Stage 1 airplane operations with Stage 3 craft. If the Agreement is violated at all, it is by RAI's having disposed of its fleet and gone out of the fleet carrier business rather than take delivery of the Stage 3 planes. And that would violate the Agreement only if the Agreement is construed to require RAI to go on flying Stage 3 planes empty in spite of lack of customers or cargo. In any event, such a violation (if it were found to have occurred) is quite separate from the question whether RAI may hire out its pilots to fly customers' planes that conform fully to the Authority's regulations.

Both the express language and the obvious sense of the Agreement was to exempt RAI's use of its Stage 1 aircraft for a time on the condition that it replace them with Stage 3 craft *for continued operation of its fleet.* But it has not continued such operations. It lost its customer (which went in-house), terminated its fleet operations and let go of its fleet without taking delivery of the now unnecessary Stage 3 planes.

It will of course be open to the Authority to argue at trial, as to the Emery operations, that the new arrangement (whereby Emery went in-house) is a sham concocted between RAI and Emery to circumvent the undertaking to use Stage 3 planes. If this were shown, it might well undermine RAI's contentions as to whether the agreement covers its provision of pilot service to Em-

ery. The present record, however, shows no such thing and leaves considerable doubt whether the RAI's provision of pilot service to Emery in any way breaches the 1982 Agreement.[1] In any event, this would have no bearing on RAI's operation of Burlington's plane, as RAI's fleet was doing no business with Burlington at the time of the 1982 Agreement.

■ The Authority points also to the agreement it obtained from RAI on March 26, 1986 as an independently valid binding contract. There are two weaknesses to this argument. First, RAI promised only to be bound by the 1982 Agreement. If the 1982 Agreement did not bar RAI from liquidating its fleet and rendering pilot service to planes of customers that conformed to the Port Authority regulations, neither is this barred by the March 26, 1986 agreement.

A further question arises whether the March 26, 1986 agreement should be void because it was obtained under duress. The Authority had effectively seized Emery's DC–8 by ordering that it be denied fuel and service. Failure to obtain the plane's release could easily have ruined RAI; Emery could have the plane freely operated at Newark by any other pilot service.

As the Court of Appeals has held, "duress may take the form of unlawful restraint of property or use of wrongful economic compulsion to force a party to yield to demands that would otherwise be rejected." *First National Bank of Cincinnati v. Pepper,* 454 F.2d 626, 632 (2d Cir.1972). If the 1982 Exemption Agreement is not applicable to RAI's provision of pilot service to carriers or fleet operators, RAI might well succeed in showing that the constructive seizure of the Emery DC–8 was an "unlawful restraint of property." It is settled law in this Circuit that "a contract made by the owner [of wrongfully seized property] to emancipate his property is considered as one made under duress

---

**1.** RAI also argues with some force that ambiguities in a form contract should be construed against the institution that drafted it. *See Semmes Motors v. Ford Motor Co.,* 429 F.2d 1197, 1207 (2d Cir.1970) (Friendly, J.). *See also Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 10 n. 2 (2d Cir.1983) (*contra perferentem* used only as a last resort).

and thus avoidable." *Id.* (citing *Hellenic Lines v. Louis Dreyfus Corp.*, 249 F.Supp. 526, 529 (S.D.N.Y.1966), *aff'd*, 372 F.2d 753 (2d Cir.1967).)

In fact, even if the 1982 Agreement did bar RAI from providing pilot service to Emery's Stage 2 planes, a question nonetheless remains whether the Authority's effective seizure of the plane exceeded the permissible limits of lawful self-help in enforcing contract rights.

As to the applicability of the Exemption Agreement to the present situation, plaintiff has succeeded in demonstrating sufficiently serious questions going to the merits to merit the award of injunctive relief.

### B. *Federal Preemption*

■ Plaintiff further argues that this application of the Port Authority noise control regulations was preempted by the FAA Fleet Compliance Program. The Court of Appeals held in *Global Int'l Airways v. Port Authority*, 727 F.2d 246, 250 (2d Cir. 1984) that the Authority's Interim Rule was not *facially* preempted by the federal regulation. The Court of Appeals' opinion, however, appears to hold that the issue of fleet composition was either preempted or immune from more exacting state regulation. The FAA regulations had been designed to achieve noise reduction over time by gradual changeover of fleet composition on a schedule that would not place unreasonable financial burden on fleet operators. The Court explained that "local regulation which in fact affects fleet composition of particular carriers must be examined with a view to determining precisely what that effect is and whether it is an obstacle to the accomplishment of important federal policies." *Id.* at 252. The Court further explained that "regulation which affects fleet composition has a national impact and calls for federal rather than local remedies." *Id.*

At the time RAI entered into the exemption agreement, it was in full compliance with the FAA regulations. It has submitted evidence to the effect that compliance with the Port Authority's rule would have required substantial change of its fleet composition. (Indeed, RAI has offered proof that sufficiently large freighters complying with the Authority's specifications were not even yet available.)

The present state of the record strongly suggests that compliance with the Authority's regulations (if possible to achieve) would have required at least a significant alteration of RAI's fleet composition; if so, there is a substantial question whether the Authority's enforcement of its regulation against RAI went beyond the Authority's proper exercise of power. *Global, supra.* It is insufficient to answer that the Authority's asserted rights are based on contractual agreement rather than on its regulations, since the agreement was extracted as a price for forebearance in an enforcement of questionable legality.

The Port Authority claims on the other hand that RAI had engaged in "deliberate retrogression" on its use of Stage 1 aircraft and relies on language of the *Global* opinion to the effect that a carrier who engages in such practice should not be heard to complain of the Authority's interference with its fleet composition. On the present record, the Authority has by no means shown that reasonable alternatives were available to RAI.

Although the contract issue discussed above furnished sufficient substantial questions as to the merits making it unnecessary to consider the preemption and retrogression arguments at this point, it seems clear that those issues also present substantial questions for litigation which further reinforce RAI's entitlement to a preliminary injunction based on its clear exposure to irreparable harm and the balance of hardships.

### III. *Legal Defenses*

■ The Port Authority contends that RAI is barred from seeking equitable relief by reason of laches and "dirty hands." Plaintiff's delay in suing for relief was, at most, only of the few months after the Port Authority's advice that it considered

the Exemption Agreement unaffected by the change in business circumstances. All of that time plaintiff was attempting to engage in negotiations with defendant on this very issue. In any event, the Authority has shown no significant prejudice resulting from the delay. *Julius Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016, 1024 (S.D.N.Y.1979).

As to its claim of unfair dealing, the Authority has failed to substantiate it. It may of course seek to do so at the trial seeking a permanent injunction.

### Conclusion

Plaintiffs have met the requirements for preliminary injunctive relief set forth in *Jackson Dairy*. A preliminary injunction is granted. Submit order.

SO ORDERED.