**ARROW AIR, INC., Plaintiff,**

v.

**The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant.**

**No. 85 Civ. 0037 (MP).**

United States District Court, S.D. New York.

Feb. 11, 1985.

---

Butler, Fitzgerald & Potter, by Thomas A. Butler, David G. Samuels, Michael G. O'Neill, New York City, for plaintiff.

Patrick J. Falvey, Milton A. Pachter, Arthur Berg, Jay Selcov, The Port Authority of N.Y. and N.J., New York City, for defendant.

## ·DECISION AND OPINION

MILTON POLLACK, Senior District Judge.

Plaintiff, Arrow Air, Inc. (Arrow), a diversified passenger and cargo air carrier incorporated in 1981, seeks to enjoin The Port Authority of New York and New Jersey (Port Authority), the owner and operator of John F. Kennedy Airport (JFK), from enforcing its noise level restrictions which became effective on January 1, 1985, and which prevent Arrow from using DC–8 (60 series) equipment, referred to as Stage 1 aircraft, at JFK, since they do not comply with those noise restrictions. Federal noise restrictions similarly prevent using such equipment, effective January 1, 1985. However, the Federal Aviation Administration (FAA) on an application by Arrow, filed on August 2, 1984, granted Arrow, at the last minute, a limited exemption on December 28, 1984, until July 31, 1985, from the operation of the federal restrictions. The Port Authority has refused to grant a similar exemption from the noise requirement applicable to JFK to Arrow. Arrow sues for relief from the Port Authority's refusal to grant an exemption similar to the federal exemption.

Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332, and federal question, 28 U.S.C. § 1331.

The suit was tried at a Bench trial. In conformity with Fed.R.Civ.P. 65(a)(2), the Court, at the commencement of the hearing on plaintiff's application for a preliminary injunction, ordered the trial on the merits to be advanced and consolidated with the hearing on the preliminary injunction.

For the reasons shown hereafter, the injunction sought will be denied and the plaintiff's amended complaint will be dismissed.

### I. *Regulatory Framework*

Arrow intends to fly a DC–8 (60 series), Stage 1, aircraft from JFK to Borinquen, Puerto Rico daily, and from JFK to Georgetown, Guyana twice a week. The DC–8 (60 series) aircraft does not comply with either federal or Port Authority noise standards, both effective January 1, 1985, which require muted Stage 2 or 3 aircraft.

Under the Federal Compliance Program promulgated by the FAA in December 1976, air carriers were required to phase-out and replace all their noisier and older aircraft by January 1, 1985. The FAA established a phased-in compliance schedule by grouping aircraft by noise characteristics; it termed these groupings "stages." Stage 1 aircraft are the oldest and noisiest equipment such as the Boeing 707 and the DC–8 (60 series). Stage 2 aircraft, which include the Boeing 747, are newer and somewhat quieter than the Stage 1 aircraft. Stage 3 aircraft are the most technically advanced and quietest aircraft, such as the Boeing 757, the Boeing 767, and the A–300. *See* 14 C.F.R. § 36.7. By January 1, 1985, *all* Stage 1 aircraft were to be replaced by Stage 2 or Stage 3 aircraft. *See* 14 C.F.R. § 91.303.

The Port Authority enacted a new Aircraft Noise Abatement Program on April 7, 1982. That program, like the FAA's, provided for phased-in compliance. The Port Authority's program consisted of an Interim Rule (520/0–00), a Nighttime Rule (530/0–00) (not questioned herein), and a Final Rule (540–0–00).

The Interim Rule, which took effect on March 7, 1984 following a legal challenge, required air carriers to operate 75% of their 4-engine aircraft movements with noise compliant equipment, i.e., with Stage 2 or Stage 3 equipment, or with any aircraft which is quieter than the noisiest Stage 2 aircraft operating at a particular Port Authority airport.

The Interim Rule also provided for a future owner's exemption (560/0–04) under which the Port Authority would treat a carrier's Stage 1 aircraft movements as Stage 2, where that carrier contracted with the Port Authority to utilize a Stage 3 aircraft at the Port Authority airports by January 1, 1985, and also had a lease or purchase agreement demonstrating that it would, in fact, have a Stage 3 aircraft by that date. The Port Authority's Final

Rule, which took effect on January 1, 1985, provides that only noise compliant equipment can operate at the Port Authority's airports. On December 13, 1984, the Port Authority's Board of Commissioners enacted an exemption from compliance with the Final Rule for those carriers which could demonstrate that an exemption was necessary on the grounds of national security and foreign relations. Arrow does not qualify for such an exemption; it has not satisfied the conditions therefor.

## II. *The Equities*

Arrow began its operations in 1981, five years after the FAA promulgated the Fleet Compliance Program and about a year before the Port Authority enacted its amended Noise Abatement Program. Arrow has concentrated on leasing noncompliant aircraft. In fact, as of the date of the trial, only two DC–10s in Arrow's fleet comply with the federal and Port Authority noise standards; and its nine DC–8s (60 series) are noncompliant aircraft. Prior to January 1, 1985, compliant aircraft have been available in the market for lease or purchase.

Pursuant to a contractual agreement entered into by Arrow with the Port Authority on March 7, 1984, Arrow was granted a future owner's exemption from the Port Authority's Interim and Nighttime Rules, and permitted to conduct its operations at JFK and Newark International Airports with Stage 1 aircraft, and have those aircraft treated as Stage 2 aircraft, provided that it would lease, in accordance with two existing aircraft leases between Arrow and its affiliate, International Air Leases, Inc. (IAL), in December 1984, a DC–8–73 CF aircraft (a re-engined DC–8–63) U.S. Registration No. N6161A, and a DC–10 aircraft, U.S. Registration No. N917C1, and immediately upon delivery place such aircraft in service at JFK and Newark Airports. In that future owner's exemption contract, Arrow also agreed to "comply with all other applicable provisions of the Port Authority's Interim, Nighttime, and Final Rules."

Arrow has not re-engined the specified DC–8 aircraft, No. N6161A, and the specified DC–10 aircraft is no longer in Arrow's fleet. Instead of having No. N6161A re-engined, Arrow scheduled this aircraft to be "Hush Kitted" by the Nacelle Corporation.

Arrow planned to install so-called Hush Kits on its noncompliant Stage 1 aircraft to make them compliant by January 1, 1985. Arrow contracted, on October 15, 1984, with the Nacelle Corporation, a company 50% owned by George Batchelor, Chairman of Arrow's Board of Directors, for ten Hush Kits for its DC–8 (60 series) aircraft. However, technology for the Hush Kits to quiet the noise from the DC–8 (60 series) simply did not develop in time, ostensibly because of strike difficulties. As of this date, the FAA has not certified any Hush Kits, albeit that Arrow believes that the technology therefor will be available to it by July 31, 1985, and that it will be successful. Arrow suggests that it did not learn, until November 1984, that the Hush Kit technology would be unavailable. However, the record indicates that on August 2, 1984, fully three months earlier, Arrow had applied to the FAA for an exemption from the January 1, 1985 deadline for compliance with the federal requirements. Arrow asserted therein that it would be unable to install the Hush Kits by the January 1, 1985 deadline.

During most of 1984, Arrow had under lease from IAL, its affiliate, a compliant DC–8 (70 series) aircraft. Arrow and IAL are corporate members of the Batchelor group, so-called. George Batchelor is the Chairman of the Board of Arrow and owns 100% of IAL. The plane was sold by IAL in October, 1984, under a contract made earlier for a price of $20–$22 million, leaving Arrow without any compliant DC–8s.

Since it started operations, Arrow has been able to purchase noncompliant DC–8 (60 series) aircraft at a discount rate price of $5 million; a compliant DC–8 (70 series) aircraft costs $20–$22 million on the open market, while it costs $18 million to re-engine a DC–8 (60 series) aircraft into a DC–8 (70 series) aircraft. A DC–8 (60 series)

costs $90,000 a month to lease, whereas a DC–8 (70 series) aircraft costs $240,000 per month to lease. Even after it became apparent that Hush Kits would be unavailable timely, Arrow made no effort to look for compliant aircraft. IAL's Director of Sales and Marketing admitted in his testimony that in November, 1984, a compliant B–727–200 cost $8–$9 million, and that such equipment could have been acquired.

Arrow claims that it cannot possibly compete on the Georgetown and Borinquen routes unless it can use the Port Authority's facilities in New York, and that it would be uneconomical to operate from JFK with the more expensive noise compliant equipment. However, Guyana Airways, Arrow's competitor on the Guyana route, operates its flights from JFK to Georgetown fully with noise compliant aircraft and charges the same price for its Georgetown service as Arrow. Arrow estimates that the cost of operating a DC–8–73 versus a DC–8–63, is $21 per seat on a 100% load.

If Arrow operated a DC–8–73 aircraft to Borinquen, its prices would be "pretty close" to what is being charged to Puerto Rico by other airlines, even though the other airlines have noise compliant equipment.

The Port Authority, in the past, has been sued for damage by the communities around JFK and the freight and expense of defending such suits is a factor that the Port Authority properly takes into consideration in adhering to the noise control enactment. The enforcement of the Port Authority noise rules and the future owner's exemption program have led to a decrease in noise at Port Authority airports as of January 1, 1985, due to the introduction of Stage 3 aircraft. The evidence fails to establish that the Port Authority's Final Noise Rule will cause any irreparable harm to Arrow. It is conceded by Arrow that Georgetown is a very low budget operation, even with noncompliant equipment. The Port Authority contends, with considerable support, and Arrow disputes, that a DC–8 (70 series) aircraft is suitable for operation to Guyana and to Borenquin, Puerto Rico.

Even though Arrow applied for an FAA exemption in August, 1984, it made no similar request to the Port Authority until December 31, 1984 in the afternoon before the long-awaited and expected date of compliance. Indeed, it attempted, and failed to obtain, a Temporary Restraining Order against the Port Authority from Judge Sofaer on December 31, 1984; that attempt was rejected as dilatory and wanting in equity. The equities do not favor imposing on the Port Authority and surrounding communities a further extension of the airport's operating rules for noise control.

### III. *Preemption*

■ The Second Circuit has repeatedly affirmed the Port Authority's "power and ... responsibility to establish fair, even-handed and nondiscriminatory regulations designed to abate the effect of airplane noise on surrounding communities." *British Airways Board v. Port Authority*, 564 F.2d 1002, 1004 (2d Cir.1977) ("*Concorde II*"). *See also Global Int'l Airways Corp. v. Port Authorities*, 731 F.2d 127, 130 (2d Cir.1984) ("*Global II*"); *Global Int'l Airways Corp. v. Port Authority*, 727 F.2d 246 (2d Cir.1984) ("*Global I*"); *British Airways Bd. v. Port Authority*, 558 F.2d 75, 84 (2d Cir.1977) ("*Concorde I*").

■ Contrary to Arrow's assertion, nothing in *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), casts any doubt on the authority of an airport proprietor to regulate aircraft noise. In *City of Burbank*, the Supreme Court held only that a *municipality*, using its *police powers*, could not limit the time in which aircraft can takeoff and land. *Id.* at 635–36 n. 14, 93 S.Ct. at 1861 n. 14. The Court said, "We do not consider here what limits, if any, apply to a municipality as a proprietor." *Id.* In fact, the Court noted that the Senate Report and a letter from the Secretary of Transportation said that airport owners acting as proprietors could continue

to "deny the use of their airports on the basis of noise considerations so long as such exclusion is non-discriminatory." *Id.*

Plaintiff's argument that the Aviation Safety Noise Abatement Act of 1979 ("ASNA"), Pub.L. 96–193, 94 Stat. 50 (codified as amended at 49 U.S.C. §§ 2101–2125), limits airport proprietors' rights to promulgate noise regulations, overshoots the mark. "The legislative history of ASNA indicates that it was not intended to alter the existing allocation of powers between the federal government and airport proprietors. S.Rep. No. 52, 96th Cong., 2d Sess. 13, *reprinted in* 1980 U.S.Code Cong. & Ad.News 89, 91–92, 117." *Global I,* 727 F.2d at 249.

Moreover, in *Global I* and *Global II,* which were decided well after the enactment of the ASNA, the Second Circuit specifically reaffirmed the right of "airport proprietors to establish requirements as to the levels of permissible noise created by aircraft using their airports. This power includes the right to deny use of airports to aircraft on the basis of nondiscriminatory criteria." *Global I,* 727 F.2d at 248.

In *Global I,* the Second Circuit upheld the facial validity of the Port Authority's Interim Rule against preemption attacks. As mentioned, the Interim Rule required air carriers to perform 75% of their 4-engine movements with Stage 2 or Stage 3 aircraft, whereas the FAA rule required only that 50% of an air carrier's 4 engine aircraft be Stage 2 or Stage 3 aircraft. *Id.* at 249. The court said, "The federal policy reflected by the Fleet Compliance Program is a measured change in fleet composition in the direction of noise reduction. Local regulations of noise levels which deter a carrier from purchasing and introducing Stage 1 aircraft into its fleet are not an 'obstacle to the accomplishment' of that program." *Id.* at 252.

The Port Authority's Final Rule does not "stand[ ] as an obstacle to the accomplishment and execution of 'an established federal policy.'" *Id.* at 248, *quoting, Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). In granting the exemption to Arrow, the FAA said, "The goal of the FAA noise rule, as well as the ASNA, is to reduce the adverse effects of aviation noise on the public. It has been the intent of the FAA to implement the rule, while, if possible, attempting to avoid disrupting any significant segment of the aviation industry."

The FAA granted the exemption to Arrow because it was concerned that, without an exemption, Arrow would have to curtail most of its flights to San Juan, Puerto Rico. Arrow has seven flights weekly to San Juan from JFK, five flights weekly from Miami, five flights weekly from Philadelphia, two flights weekly from Montreal, and two flights weekly from Toronto. The FAA noted that Arrow is "the third largest air carrier serving San Juan" and such service "constitute[s] a major source of its revenue."

The Port Authority has not curtailed any of Arrow's flights from JFK to San Juan since Arrow operates DC–10s on that route. It chooses not to operate DC–10s to Borinquen and Georgetown; neither of those routes were mentioned in the FAA exemption. Arrow continues to operate the rest of its service to San Juan from numerous points of departure.

The Port Authority's Final Rule does not impede the FAA's purpose in granting Arrow an exemption, namely to permit Arrow to fly to San Juan. Moreover, the Final Rule reenforces the ASNA and Fleet Compliance Program's general policy of requiring air carriers to fly quiet, noise compliant aircraft by January 1, 1985 and thereafter.

IV. *Reasonable and Nondiscriminatory*

Since the Port Authority's Final Rule is not preempted, the Court must determine whether it is being administered in a discriminatory manner. *See Global I,* 727 F.2d at 248. Arrow contends that the regulation is being administered in a discriminatory manner because the Port Authority permits Icelandair to fly noncompliant DC–8 (60 series) aircraft into JFK and allows other air carriers to land noncompliant

BAC 111s, Boeing 737s, and DC–9s in Port Authority airports.

■ When local economic regulation is challenged as being discriminatory the court "presume[s] the constitutionality of the statutory discriminations and require[s] only that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Duke,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

■ The Port Authority has so far authorized only one exemption to its Final Rule, and that was granted at the express request of the United States Department of State because of international policy considerations. Acting Secretary of State Van Dam requested that Icelandair be granted an exemption since it provides the only direct service between Iceland and the United States. Mr. Van Dam wrote, "This service is of significant strategic importance to the U.S. in light of the existence of military installations and equipment of the United States located in Iceland."

Before granting any exemption to Icelandair, the Board of Commissioners of the Port Authority promulgated a rule of general applicability. Air carriers to foreign destinations may continue to operate noncompliant aircraft until November 30, 1985, if they satisfy four criteria: 1) The carrier must provide the sole scheduled passenger service between New York and a foreign country with New York being the primary service to the United States; 2) The FAA must have exempted the carrier from the federal noise regulations; 3) The United States Department of State must request in writing that the Port Authority grant an exemption based on "foreign relations and national security" grounds and the unique situation of the airline; and, 4) The carrier must enter into an agreement with the Port Authority, providing among other things, that it will obtain and utilize any conforming aircraft in its fleet at JFK to the extent such aircraft can reasonably be used for such service. The Port Authority's Deputy Director of Aviation, Mr. Sloane, testified

that it is possible for other carriers to meet the exemption's requirements.

The Port Authority gave Icelandair a limited exemption until November 30, 1985, to fly 2 DC–8 (60 series) aircraft into JFK. In consideration for the limited exemption, Icelandair agreed to employ a compliant DC–8–71 for at least 50% of its operations at JFK during the period of the Agreement.

Arrow, by contrast, is not the only air carrier operating from JFK to Georgetown. Guyana Airways operates from New York to Georgetown with only one stop and takes only 1½ hours longer than Arrow. The JFK-Borinquen service is a domestic operation and Arrow is not the only air carrier servicing Puerto Rico. There has been no showing that any of Arrow's transportation is necessary for our national security, and the State Department has not requested a Port Authority exemption for Arrow, although Arrow has requested a letter similar to that written for Icelandair.

The Port Authority authorized the Icelandair exemption because the Secretary of State said that it was necessary for national security. The Port Authority made a distinction based on a reasonable classification to give exemptions only when the air carrier could show that the exemption was in the national interest.

Arrow contends that the Port Authority also discriminates by permitting noncompliant 2-engine BAC 111s, Boeing 737s, and DC–9s, to land and takeoff from JFK, Newark, and LaGuardia, but not allowing noncompliant 4-engine DC–8 (60 series) aircraft to have similar access. A Port Authority regulation permits an aircraft to come into a Port Authority airport if it is quieter than the noisiest federally certified aircraft. Federal Aviation Regulation, 14 C.F.R. Part 36.

A qualified expert explained that the FAA Advisory Circular on aircraft noise shows that the BAC 111, Boeing 737, and DC–9 aircraft are quieter than the DC–8 (60 series) aircraft on takeoffs and landings. The FAA Circular is accepted in the industry and trade. For example, the

DC–8 (60 series) aircraft is about 13–14 decibels louder than the BAC 111, which means that it is "about two to three times as loud from a cumulative noise point of view.... [A]bout 20 BAC 111 takeoffs would have the same cumulative noise as one DC–8–62, or 63."

Arrow contends that the FAA Advisory Circular assumes that an aircraft will cutback on thrust at takeoffs. If the BAC 111 uses full thrust, then it will emit a higher noise level. The Port Authority permits the pilot to use full thrust in emergency situations, but the airline must follow up with a satisfactory reason for the pilot's decision. If the airline's reason is not satisfactory, the Port Authority keeps "after them and they change their procedure so they can conform."

The Port Authority's rule reasonably permits certain 2-engine aircraft to continue operating since they are quieter than the noisiest Stage 2 aircraft operating at JFK. The Port Authority has established reasonable procedures to make sure that aircraft shall conform to the noise requirements.

V. *Commerce Clause*

Arrow urges that the Port Authority's regulation violates the Commerce Clause because it imposes an undue burden on commerce.

■ "Evenhanded local regulation to effectuate a legitimate local public interest is valid unless preempted by federal action, [citations omitted], or unduly burdensome on maritime activities or interstate commerce." *Huran Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 815–16, 4 L.Ed.2d 852 (1960).

■ Arrow points out that it is the only non-stop U.S. flag service from JFK to Georgetown and Borinquen. However, since Guyana Airways provides comparable service to Georgetown at the same charge, interstate commerce is not unduly burdened. Similarly, numerous air carriers fly to San Juan, Puerto Rico from JFK. Aircraft regularly fly between San Juan and Borinquen. Arrow urges that the Gover-

nor of Puerto Rico estimated that 1000 jobs would be lost if Arrow stopped flying into San Juan and Borinquen. But the Governor was speaking about the effect on the Puerto Rican economy if Arrow stopped flying into *both* San Juan and Borinquen from numerous points of departure. He did not make any estimates of the effect of the loss of one DC–8 flight daily into Borinquen.

Since January 1, 1985, Arrow has been able to fly to Borinquen and Georgetown from Philadelphia and Stewart Airports. It has also subleased aircraft from two other airlines for its Borinquen route. Arrow complains that it probably cannot continue service to Georgetown from these airports because the State Department has only designated JFK as the point of departure in Arrow's permit to serve an international route. However, Arrow's President Murray acknowledged that Arrow has not tried to change its State Department designation.

Arrow urges that the noise regulation will alter its market and cause it economic harm. Arrow earns $10 million annually of which only $4 million comes from its numerous scheduled passenger flights. Although Arrow's President Murray was unable to testify as to the fraction the Georgetown and Borinquen flights contribute to the $4 million in passenger revenue, he did testify that the Georgetown route has a low yield, even with noncompliant equipment.

■ If a regulation is otherwise valid under the Commerce Clause it is not rendered invalid simply because an operator has to change its market structure. In *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978), the Supreme Court rejected the "notion that the Commerce Clause protects the particular structure or method of operation in a retail market." In *Exxon*, the Supreme Court upheld a Maryland statute which prohibited producers or refiners from operating retail service stations within Maryland, even though "the consuming public will be injured by the loss

of high-volume, low priced stations." *Id.* at 128, 98 S.Ct. at 2215.

This case is quite different from *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), *Bibb v. Navajo Freight Lines Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), and *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), on which Arrow relies. In *Raymond Motor,* the Supreme Court struck down a state safety regulation which simply could not be justified on safety grounds because it did not "contribute to highway safety." *Raymond Motor,* 434 U.S. at 444, 98 S.Ct. at 795. In *Navajo Freight Lines,* the Supreme Court struck down a questionable safety regulation because of its "clear burden on commerce." *Navajo Freight Lines,* 359 U.S. at 530, 79 S.Ct. at 968. In *Washington State Apple Advertising Comm'n,* the Supreme Court struck down North Carolina regulations which constituted an unjustifiable preference to local producers.

The scientific data behind the ASNA, Fleet Compliance Program, and Final Rule make it clear that the Stage 1 aircraft used by Arrow are unquestionably noisier than either Stage 2 or Stage 3 aircraft. The Port Authority is pursuing an important local interest in "protecting the local populace from airport noise." *Concorde II,* 564 F.2d 1010. Any affects on interstate commerce from the fact that Arrow Air cannot obtain an exemption from the Final Rule "are only incidental." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). There is no claim of local preference.

Even if the Port Authority's Final Rule had more than an incidental effect on interstate commerce, the Court would uphold it. "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983).

"[I]t is manifest from our scheme of aviation management that Congress has consciously committed to airport owners the responsibility for determining the permissible levels of noise for the facility and its environs." *Concorde I,* 558 F.2d at 83 n. 2. So long as the "local action ... advances and is consistent with federal policy," *id.* at 84–85, the airport proprietor can regulate the noise levels.

### VI. *Conclusion*

Here, as in the *Concorde* and *Global* litigations, Congress has authorized airport proprietors to enact reasonable, nondiscriminatory noise regulations. The Port Authority's Final Rule fully meets these criteria and any affect on commerce is both incidental and authorized by Congress.

The foregoing shall constitute the findings of fact and the conclusions of law pursuant to Fed.R.Civ.P. 52(a).

The complaint is dismissed, with costs. So Ordered.