**In re ARROW AIR, INC., Debtor.**

**ARROW AIR, Plaintiff,**

**v.**

**The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant.**

**Bankruptcy No. 86–00340–BKC–AJC. Adv. No. BKC–AJC–A–86–0110.**

United States Bankruptcy Court, S.D. Florida.

March 17, 1986.

Findings of Fact and Conclusions of Law April 17, 1986.

Arthur P. Berg and Milton H. Pachter, New York City; John Kozyak, Kozyak, Tropin & Throckmorton, Miami, Fla., of counsel, for defendant Port Authority of New York and New Jersey.

Timothy J. Norris, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for plaintiff Arrow Air, Inc.

## ORDER APPROVING REJECTION OF EXEMPTION AGREEMENT BETWEEN ARROW AND PORT AUTHORITY

A. JAY CRISTOL, Bankruptcy Judge.

This cause came before the Court for hearing on March 13, 1986, upon the Debtor in Possession's Alternative Motion to Reject Executory Contract. The Court has reviewed the motion and memoranda of law submitted by both Arrow Air, Inc., Debtor in Possession ("Arrow"), and the Port Authority of New York and New Jersey ("the Port Authority"), has heard the evidence presented and the argument of counsel for Arrow and the Port Authority, and the Court makes the following findings of fact and conclusions of law.

On April 7, 1982 the Port Authority adopted Aircraft Noise Restrictions ("the Restrictions") applicable to all air carriers operating at airports subject to its jurisdiction, including John F. Kennedy International Airport ("JFK"). Under the Interim Rule of the Restrictions, all carriers were required as of January 1, 1983 to operate 75% of their movements at Port Authority airports with Stage 2 or Stage 3 aircraft.[1] Under the Final Rule of the Restrictions, Stage 1 aircraft were not permitted to operate at Port Authority airports after January 1, 1985.

---

1. As defined in the Restrictions and applicable Federal Aviation Regulations, 14 C.F.R. Part 36, Appendix C, Stage 1 airplanes are the least quiet aircraft, and Stage 3 airplanes are the quietest. Both Stage 2 and Stage 3 aircraft are defined to be "noise compliant."

The Restrictions, notwithstanding the percentage limitations of the Interim Rule, also permitted carriers to enter into an "Exemption Agreement" with the Port Authority which would permit the carrier to operate Stage 1 aircraft at these airports up to January 1, 1985 if that carrier agreed to replace the Stage 1 aircraft it operated at those airports with Stage 3 aircraft by January 1, 1985.

On March 7, 1984, Arrow and the Port Authority entered into such an agreement (the "Exemption Agreement"). Arrow placed into service two Stage 3 aircraft at JFK in December of 1984. In mid-December, 1985, Arrow had begun operating cargo operations at JFK with Stage 2 aircraft; by mid-January, 1986, Arrow was no longer operating any Stage 3 aircraft at JFK. On January 29, 1986, the Port Authority advised Arrow that it interpreted the Exemption Agreement as imposing upon Arrow the obligation to use at least two Stage 3 aircraft for as long as Arrow operates at Port Authority airports. The Port Authority further advised Arrow that under this interpretation, Arrow would be prohibited from conducting Stage 2 cargo operations at JFK since Arrow no longer operated any Stage 3 aircraft at JFK.

On February 11, 1986, Arrow filed a petition under Chapter 11 of the Bankruptcy Code. As a result of the Port Authority's interpretation of, and its directives regarding, the Exemption Agreement, Arrow suspended its cargo service operations at JFK on February 14, 1986. On February 18, 1986, Arrow filed an adversary proceeding in this Court, styled *Arrow Air, Inc. v. The Port Authority of New York and New Jersey*, Adv.Pro. No. 86–0110–BKC–AJC–A, in which it sought a declaratory judgment that the Exemption Agreement had expired by its terms and a permanent injunction prohibiting the Port Authority from denying Arrow permission to operate Stage 2 cargo operations at Port Authority airports.

On February 21, 1986, after hearing testimony and argument from counsel, this Court entered a Temporary Restraining Order prohibiting the Port Authority from denying Arrow permission to operate one Stage 2 cargo flight per day from JFK. Another hearing was held on Arrow's request for a declaratory judgment and permanent injunction on March 5, 1986 during which the Court heard testimony and the arguments of counsel. On March 13, 1986, the Court announced its ruling in favor of the Port Authority with respect to the adversary proceeding. The Court held the Exemption Agreement to be an enforceable contract obligating Arrow to operate at least two Stage 3 aircraft at Port Authority airports for as long as Arrow operates at those airports.[2]

Throughout the adversary proceeding, the Port Authority maintained that the Exemption Agreement obligated Arrow to operate two Stage 3 airplanes for its scheduled movements at Port Authority airports or discontinue service at those airports, and that this obligation was to continue so long as Arrow chose to operate at Port Authority airports. On March 5, 1986, Arrow filed its Alternative Motion to Reject Executory Contract seeking court approval to reject the Exemption Agreement as an executory contract pursuant to 11 U.S.C. § 365.

In its alternative motion and memorandum of law, Arrow maintained that since material obligations remained to be performed under the Exemption Agreement by both Arrow and the Port Authority, the agreement should be deemed an executory contract which it could reject. Alternatively, Arrow took the position that if no material obligations remained to be performed on the Port Authority's part, the agreement should nevertheless be considered a rejectable executory contract since to do so would promote Arrow's Chapter 11 reorganization. The Port Authority, on the other

---

**2.** In so ruling, the Court relied on the rule of law that contracts are only to be construed against the drafter as a last resort and then only where there are two reasonable interpretations.

The Court did not find Arrow's interpretation that the Exemption Agreement expired on January 1, 1985 to be reasonable.

hand, maintained in its memorandum of law in opposition to Arrow's motion that it had fully performed all of its obligations under the Exemption Agreement by permitting Arrow to operate its Stage 1 aircraft at Port Authority airports until Arrow received its Stage 3 aircraft. The Port Authority also took the position that the only obligations remaining to be performed were those of Arrow, including Arrow's obligation to use two Stage 3 aircraft at Port Authority airports for as long as Arrow chose to operate at those airports.

This Court conducted a hearing on Arrow's alternative motion on March 13, 1986. The Port Authority presented the testimony of Kelsey Moffett, Manager of the Business Administration Division of JFK. Mr. Moffett testified, *inter alia*, that the Port Authority was a public agency and that through its acceptance of federal aid, the Port Authority would permit any and all carriers who wish to enter and use a Port Authority airport to use the airport without discrimination. The Court also heard oral argument by counsel representing both Arrow and the Port Authority prior to announcing its ruling on Arrow's Alternative Motion to Reject Executory Contract.[3]

Based on the content of the Exemption Agreement and on the testimony of the witnesses presented by Arrow and the Port Authority at the hearings in both the adversary proceeding and with respect to this motion, the Court finds that there exists a continuing and ongoing relationship between Arrow and the Port Authority under that agreement, and that under the agreement there are continuing material obligations remaining to be performed in the future on the part of both Arrow and the Port Authority. The obligations of Arrow include, but are not limited to, its use of two Stage 3 aircraft at Port Authority airports for as long as it operates at such airports. The obligations of the Port Authority include, but are not limited to, its providing Arrow with access to Port Authority airports and airport services in a non-discriminatory manner.

The Court also finds that, based on the evidence presented by Arrow, approximately $14 million of Arrow's total cargo revenues of $22 million for the next 12 months would be derived from its cargo operations at JFK, and that minimal harm as a result of noise would be experienced if the Exemption Agreement is rejected and Arrow operates two less Stage 3 aircraft per day at that airport. It would also cost Arrow's estate substantially more to acquire Stage 3 aircraft (i.e., re-engined DC–8's at a cost of approximately $20 million each), which it does not now possess, than to use the hush-kitted Stage 2 DC–8's (which cost approximately $10 million each) it presently possesses.

■ Based on these findings, the Court concludes that there exist sufficient material obligations remaining to be performed by both Arrow and the Port Authority under the Exemption Agreement such that the agreement satisfies the "Countryman" definition of an executory contract under 11 U.S.C. § 365. *See, e.g., In re Waldron*, 36 B.R. 633, 636 n. 2 (Bkrtcy.S.D.Fla.1984); *In re Charter Co.*, 52 B.R. 267, 270 (Bkrtcy.M.D.Fla.1985); Countryman, "Executory Contracts in Bankruptcy: Part I," 57 *Minn.L.Rev.* 439 (1973). The "Countryman" definition provides:

> [W]e approach a definition of executory contract within the meaning of the Bankruptcy Act: a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. 57 *Minn.L.Rev.* at 460.

The cases cited by the Port Authority fail to support its contention that the Exemption Agreement is not an executory contract. The Exemption Agreement imposes obligations on both Arrow and the Port Authority, thereby compelling the conclu-

---

**3.** Mr. Moffett also testified that in 1981 Arrow and the Port Authority had entered into an agreement permitting Arrow to obtain fuel at JFK.

sion that the agreement is executory under the traditional Countryman definition. *In re Charter Co.*, 52 B.R. 267 (Bkrtcy.M.D. Fla.1985) and *In re Coast Trading Co.*, 744 F.2d 686 (9th Cir.1984) are not contrary to this result. In *Charter*, the brokerage agreement at issue was held not to be executory since it imposed no obligations on the broker at the time of the filing of the petition since he had already procured a ready, willing, and able purchaser for the debtor. Similarly, in *Coast Trading*, the contract for delivery of grain was held not to be executory where the seller had already delivered the grain. In both cases, the sole obligations remaining were the debtor's obligations to pay money.

Furthermore, the obligation imposed upon Arrow to indefinitely operate two Stage 3 aircraft and the corresponding obligation upon the Port Authority to permit Arrow to operate at Port Authority airports under these circumstances are at least equal in degree and materiality to those mutual obligations imposed by the option contract in *In re Waldron*, 36 B.R. 633 (Bkrtcy.S.D.Fla.1984) and the airline tickets in *In re Knutson*, 563 F.2d 916 (8th Cir.1977). In both cases, the contracts were held to be executory.[4]

■ The Port Authority has argued that it has fully performed its obligations under the Exemption Agreement, and that since obligations do not therefore remain to be performed on both sides of the agreement, it is not an executory contract. However, even assuming *arguendo* that the Port Authority has fully performed, this argument must fail for two reasons. The legislative history of § 365, and the statute itself, establish that it is not always the case that there must be outstanding obligations on the part of both parties to the contract, in order for a contract to be deemed executory. Secondly, the Exemption Agreement at issue in this case is executory under the "functional" approach to defining executory contracts.

The express language of § 365 reflects that Congress did not adopt a specific definition of an "executory contract" which would require mutual obligations, in spite of its clear opportunity to do so. The legislative history to that section evidences that Congress considered mutual obligations to be indicative of an executory contract in some, but not all, cases:

> Though there is no precise definition of what contracts are executory, it *generally* includes contracts on which performance remains due to some extent on both sides. H.R.Rep. No. 595, 95th Cong., 1st Sess. 347, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5844. (Emphasis added).

An exception to this *general* definition of an executory contract is found in § 365(i), which treats as executory those contracts for the sale of real property where the debtor is the seller of the property and the nonbankrupt is the buyer, and the seller has "fully performed" by promising to convey title upon the buyer's payment of the purchase price. The court in *In re Norquist*, 43 B.R. 224, 227 (Bkrtcy.E.D.Wash. 1984) analyzed § 365(i) similarly:

> I would suggest that continued adherence to the rigid Countryman definition will merely invite the construction of legal fictions. For example, consider the legal gymnastics required to mold a typical real estate contract into the parameters of the Countryman definition. The vendor has executed a warranty deed to the property and has delivered it to an escrow under instructions to release it to the vendee upon final payment. What material obligation remains unperformed by the vendor? I can find none, yet Professor Countryman specifically classifies this transaction as an executory contract. And so he must, for it was historically recognized that a trustee in bank-

4. *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) cannot provide support for the Port Authority's position since the executory nature of the collective bargaining agreement in that case was uncontested by the parties and was not an issue decided by the Court.

ruptcy held the authority to reject his obligations under an undesirable contract for the sale of real property. Congress specifically reaffirmed that concept in the Bankruptcy Reform Act of 1978, although placing certain restrictions upon its exercise. 11 U.S.C. § 365(i). [Footnote omitted].

Thus, the Port Authority's contention that a contract is executory only if material obligations remain to be performed on *both* sides of the agreement is rebutted by § 365 itself and its legislative history. *See also In re Booth*, 19 B.R. 53, 56 (Bkrtcy.D.Utah 1982).

Secondly, Professor Countryman suggested that executory contracts should be "defined in light of the purpose for which the trustee is given the option to assume or reject. Similar to his general power to abandon or accept the property, this is an option to be exercised *when it will benefit the estate.*" Countryman, "Executory Contracts in Bankruptcy: Part I," 57 *Minn.L. Rev.* 439, 450 (1973) (emphasis added). This "functional" approach to defining executory contracts, when considered in light of Congress' refusal to adopt the "mutual obligations" definition in all circumstances, has been characterized as follows:

> This suggests that, in the final analysis, executory contracts are measured not by a mutuality of commitments but by the nature of the parties and the goals of reorganization. *In re Booth*, 19 B.R. 53, 56 (Bkrtcy.D.Utah 1982).

Similarly, the court in *In re Norquist*, 43 B.R. 224, 225 (Bkrtcy.E.D.Wash.1984) stated that under the functional approach the purpose for allowing the debtor in possession to reject or assume an executory contract "is to enable ... a troubled debtor to take advantage of a contract that will benefit the estate by assuming it or alternatively, to relieve the estate of a burdensome contract by rejecting it."

■ Thus, even though there may be material obligations outstanding on the part of only one of the parties to the contract, it may nevertheless be deemed executory under the functional approach if its assumption or rejection would ultimately benefit the estate and its creditors.

■ Arrow's estate would derive significant benefit in terms of revenue from its cargo operations at JFK, while minimal harm in terms of noise would be experienced as a result of those operations by noise compliant aircraft. However, loss of approximately two-thirds of its cargo revenues very well could doom Arrow's prospects for rehabilitation. Thus, even assuming that the Port Authority has fully performed, the Exemption Agreement is an executory contract capable of rejection under the functional approach since that promotes the purposes of reorganization under the Bankruptcy Code.

■ In light of the benefit Arrow's estate would receive by rejecting the Exemption Agreement and being able to conduct cargo operations at JFK without having to acquire two costly Stage 3 aircraft, Arrow has satisfied the "business judgment test" for rejecting an executory contract. *In re Waldron*, 36 B.R. 633, 639 (Bkrtcy.S.D.Fla. 1984); *In re Sombrero Reef Club, Inc.*, 18 B.R. 612, 617 (Bkrtcy.S.D.Fla.1982). Thus, Arrow has established that its rejection of the Exemption Agreement should be approved. It is therefore

ORDERED that Arrow's Motion to Reject Executory Contract is hereby granted and rejection of the Exemption Agreement between Arrow and the Port Authority is hereby approved under 11 U.S.C. § 365.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Arrow Air, Inc. (Arrow), a Miami-based air carrier which seeks to operate Stage 2 aircraft at John F. Kennedy International Airport (Kennedy), commenced this action as debtor against The Port Authority of New York and New Jersey (Port Authority) for declaratory and injunctive relief regarding Arrow Air's obligation to use two Stage 3 aircraft at Port Authority airports under the terms of the Port Authority—Arrow Air Future Owner's Exemption Agreement dated March 7,

1984 (Joint Exhibit 2) and to enjoin the Port Authority from refusing to permit Arrow Air from operating Stage 2 aircraft based on the Agreement.

On February 11, 1986, Arrow Air filed for bankruptcy in this Court and on February 19, 1986, this Court issued a temporary restraining order to permit Arrow Air to operate one round-trip Stage 2 operation per day at Kennedy Airport. On March 5, 1986 and March 13, 1986 hearings were held on Arrow Air's motion for a permanent injunction. On March 13, 1986, this Court upheld the Port Authority-Arrow Air Future Owner's Exemption Agreement (Joint Exhibit 2) finding that the agreement requires Arrow Air to operate two Stage 3 aircraft at Port Authority airports as a pre-condition to any operations with Stage 2 aircraft. The Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff, Arrow Air, Inc., is a Miami-based air carrier. Arrow Air is one member of the Batchelor group of aviation companies that are controlled by Mr. George Batchelor and/or his family.

2. Defendant—The Port Authority of New York and New Jersey is a bi-State agency of the States of New York and New Jersey and operates, among other facilities, Kennedy International Airport, LaGuardia Airport and Newark International Airport in the New York metropolitan area.

3. On April 7, 1982, the Port Authority enacted a Noise Abatement Program. With regard to 4-engine aircraft the program consisted of three separate noise rules. First, an Interim Rule was established which provided that as of January 1, 1983 an air carrier must operate 75% of its movements with Stage 2 or Stage 3 equipment. Second, a Nighttime Rule was enacted which banned Stage 1 aircraft between the hours of 11:00 P.M. and 6:00 A.M. Third, a Final Rule which as of January 1, 1985 bans Stage 1 aircraft at Port Authority airports. (Joint Exhibit 1)

4. The Port Authority rules also provided for a future owner's exemption whereby a carrier could enter into an agreement with the Port Authority to operate Stage 3 planes at Port Authority airports commencing no later than January 1, 1985 and in exchange for this agreement the air carrier would be permitted to operate Stage 1 aircraft until such date. (Joint Exhibit 1)

5. On March 7, 1984, Arrow Air formally entered into a future owner's exemption agreement with the Port Authority. By the terms of its contract, Arrow Air agreed to acquire two specified Stage 3 planes, a DC–10–10 and a DC–8–73. Arrow Air further agreed that upon delivery or January 1, 1985, whichever occurred sooner, it would operate these planes at Port Authority airports for its scheduled movements until these Stage 3 planes were replaced with other Stage 3 equipment. In exchange for this commitment by Arrow Air, the Port Authority permitted Arrow Air to operate 1,200 Stage 1 movements at Kennedy Airport per year and 120 Stage 1 movements at Newark Airport per year for 1983 and 1984. (Joint Exhibit 2)

6. On or about December 1, 1984 and December 15, 1984, respectively, Arrow Air placed into service one and then a second Stage 3 aircraft at Port Authority airports. (3/5/86 TR pp. 43–44, Exhibit C)

7. On December 31, 1984, Arrow Air brought suit in the United States District Court for the Southern District of New York against the Port Authority seeking to have the Port Authority's Final Rule barring Stage 1 aircraft as of January 1, 1985 held invalid. On February 11, 1985, the Court per Judge Milton Pollack, upheld the Port Authority's Final Noise Rule, *Arrow Air v. Port Authority*, 602 F.Supp. 314 (S.D.N.Y.1985).

Based on this decision Arrow Air shifted its Stage 1 cargo operations from Port Authority airports to Stewart Airport in Newburgh, New York. (2/19/86 TR pp. 30, 37)

8. In mid-December 1985, Arrow Air contacted the Port Authority seeking per-

mission to operate Stage 2 cargo operations at Kennedy Airport. (2/19/86 TR p. 30)

9. Although permission was never granted Arrow Air introduced this Stage 2 service in late December 1985. (2/19/86 TR pp. 30, 34, 35)

10. On January 29, 1986, a meeting was held between Arrow Air and the Port Authority. At that time the Port Authority was advised for the first time that Arrow Air had terminated its leases for all of its Stage 3 equipment. Based upon its future owner's exemption agreement with Arrow Air the Port Authority on January 31, 1986 informed Arrow Air that it must cease all Stage 2 service at Port Authority airports by February 15, 1986. (3/5/86 TR pp. 59–60, Joint Exhibit 3)

11. On February 11, 1986, Arrow Air filed a petition in bankruptcy in this Court and on February 18, 1986, Arrow Air moved for a temporary restraining order and a preliminary injunction to operate Stage 2 aircraft at Port Authority airports.

12. On February 19, 1986, this Court granted Arrow Air a temporary restraining order permitting it to operate one round-trip Stage 2 aircraft flight per day at Kennedy Airport.

13. On March 5, 1986 and March 13, 1986, hearings were held in this Court on Arrow Air's application for permanent relief. At these hearings, Arrow Air maintained that all of its obligations to operate Stage 3 aircraft at Port Authority airports terminated on January 1, 1985, the date the Port Authority's Final Rule took effect.

14. The Port Authority maintained that the future owner's exemption agreement requires Arrow to operate two Stage 3 airplanes for its scheduled movements at Port Authority airports or discontinue service at Port Authority airports and that this obligation is to continue so long as Arrow Air chooses to operate at Port Authority airports.

15. The Court after hearing the evidence presented and the argument of counsel for both sides, finds the March 7, 1984 Port Authority—Arrow Air Future Owner's Exemption Agreement to be a binding contract between the parties which requires Arrow Air to operate two Stage 3 aircraft at Port Authority airports as a pre-condition to any operations with Stage 2 aircraft.

## CONCLUSIONS OF LAW

1. Pursuant to the terms of the Port Authority-Arrow Air Future Owner's Exemption Agreement this contract is required to be construed under the Laws of New York. (Joint Exhibit 2, para. 5)

2. This Court finds that it is simply not logical to conclude, as maintained by Arrow Air, that the future owner's exemption agreement terminated on January 1, 1985.

3. Arrow Air maintains that the agreement must fall for two reasons: first that since this Court has determined the agreement to be ambiguous, thus requiring the taking of testimony, the burden of proof shifts to the drafter, the Port Authority and second, that the future owner's exemption agreement is invalid since it is "perpetual". This Court rejects both of these arguments.

4. Regarding Arrow Air's claim that the contract is ambiguous and, therefore, the burden of proof shifts to the Port Authority as drafter, this Court concludes that the burden of proof does not shift from the moving party. In support of its proposition, Arrow Air has cited *Burns Manufacturing Co. v. Boehm*, 467 Pa. 307, 356 A.2d 763, 766 n. 3 (1976) and *Motor Coils Manufacturing Co. v. American Insurance Co.*, 308 Pa.Super. 568, 454 A.2d 1044 (Pa.Super.Ct.1982) neither of which supports this conclusion. This Court is persuaded by the case law cited by the Port Authority for the proposition that an ambiguity is construed against the drafter only as a last resort and then only where there are two reasonable interpretations. *National Equipment Rental, Ltd. v. Geo E. Reagin*, 338 F.2d 759 (2d Cir.1964); *Schering Corp. v. Home Insurance*, 712 F.2d 4 (2d Cir.1983); *Jacob Rottkamp, et al. v. George Eger*, 74 Misc.2d 858, 346 N.Y.S.2d

120 (Sup.Ct., Suffolk County, 1973). The Court does not find Arrow Air's interpretation to be reasonable and, therefore, any ambiguity is not relevant. Arrow Air as the moving party has the burden of proof and it has failed to satisfy that burden.

■ 5. With respect to Arrow Air's claim that the contract is perpetual and, therefore, invalid, this Court finds that under New York law, a contract is neither perpetual nor invalid simply because no termination date is specified. The key factor in evaluating an agreement is whether there is an occurrence that would result in termination. This Court concludes that there is no obligation on Arrow Air to operate at Port Authority airports and the Port Authority—Arrow Air Future Owner's Exemption Agreement is a binding contract between the parties which requires Arrow Air to operate two Stage 3 aircraft at Port Authority airports as a pre-condition to any operations with Stage 2 aircraft.

6. This Court has evaluated the cases cited by Arrow Air *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655 (S.D.N.Y.1959), *aff'd on the opinion below*, 280 F.2d 197 (2d Cir.1960), *Freeport Sulphur Co. v. Aetna*, 206 F.2d 5 (5th Cir.1953) and *Haines v. City of N.Y.*, 41 N.Y.2d 769, 396 N.Y.S.2d 155, 364 N.E.2d 820 (1977) and has determined that they do not support the proposition that this contract is "perpetual" and, therefore, invalid. The Court has reviewed the cases cited by the Port Authority. *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., infra; Payroll Exp. Corp. v. Aetna*, 659 F.2d 285 (2d Cir.1981) and *Ketcham v. Hall*, 37 Misc.2d 693, 236 N.Y.S.2d 206 (Sup.Ct.N.Y.Co.1962) *aff'd on the opinion below* 19 A.D.2d 611, 242 N.Y.S.2d 182 (1st Dept.1963) and finds these cases to be persuasive for the proposition that the contract is neither perpetual nor invalid.

7. The Court concludes that Arrow Air's interpretation of the agreement whereby its obligations to operate Stage 3 aircraft ceased on January 1, 1985 to be erroneous, the Port Authority—Arrow Air Future Owner's Exemption Agreement is a binding contract between the parties which requires Arrow Air to operate two Stage 3 aircraft at Port Authority airports as a precondition to any operations with Stage 2 aircraft.